Walker, J., delivered the opinion of the Court in which Keasler, Hervey, Richardson, Keel, and Slaughter, JJ., joined.
After Appellee, Juan Martinez, Jr., was indicted for intoxication manslaughter, he filed a motion to suppress challenging the State's seizure and search of vials of his blood which were previously drawn at a hospital for medical purposes. The trial court granted the motion, and the court of appeals affirmed. Because, under the facts of this case, Appellee has a privacy interest in the private facts contained in his blood and because the State's acquisition and subsequent testing of the blood went beyond the scope of the hospital's blood draw, Appellee's Fourth Amendment right to be free from unreasonable searches and seizures was violated, and the trial court correctly granted his motion to suppress. The judgment of the court of appeals, upholding the grant, is affirmed.
I - The Motion to Suppress
In reviewing a trial court's ruling on a motion to suppress, appellate courts apply a bifurcated standard of review. Lerma v. State , 543 S.W.3d 184, 189-90 (Tex. Crim. App. 2018) ; Ford v. State , 158 S.W.3d 488, 493 (Tex. Crim. App. 2005). Under this bifurcated standard:
The trial court is given almost complete deference in its determination of historical facts, especially if those are based on an assessment of credibility and demeanor. The same deference is afforded the trial court with respect to its rulings on application of the law to questions of fact and to mixed questions of law and fact, if resolution of those questions depends on an evaluation of credibility and demeanor. However, for mixed questions of law and fact that do not fall within that category, a reviewing court may conduct a de novo review.
Crain v. State , 315 S.W.3d 43, 48 (Tex. Crim. App. 2010) ; Guzman v. State , 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). Additionally, we review de novo questions of law, such as whether particular historical facts give rise to a reasonable expectation of privacy. State v. Hardy , 963 S.W.2d 516, 523 (Tex. Crim. App. 1997).
In this case, Appellee was involved in a traffic accident. He was taken to a hospital where his blood was drawn for medical purposes. The State later acquired and tested the blood, both without a warrant. Appellee filed a motion to suppress, arguing that the blood was obtained in violation of the federal Health Insurance Portability and Accountability Act (HIPAA) and through an improper use of the grand jury subpoena process. Appellee also argued that the acquisition and testing of the *282 blood violated a laundry list of constitutional and statutory rights, including the protections against unreasonable searches and seizures under the Fourth Amendment of the United States Constitution and article 1, section 9 of the Texas Constitution. A hearing was held, and the trial court granted Appellee's motion to suppress. The trial court made the following findings of historical fact, to which we defer:
1. On February 5, 2014, Juan Martinez was transported, by ambulance, from the scene of a traffic accident to Christus Spohn Hospital in Beeville, Texas. The Defendant was not under arrest.
2. Nurse Gary Calloway testified that, upon arrival to the hospital, "trauma procedures" were begun on the Defendant which included the taking of blood from the Defendant by the nurse for medical purposes. The Defendant was conscious during the blood draw, though not entirely coherent. There was testimony that Defendant's blood, as contained in the hospital vials, ceased to metabolize or change and that the passage of time would not change the results of a test on the drawn blood.
3. Nurse Calloway testified that, during the course of the "trauma procedures" Defendant became aware of his blood being drawn and was informed of the need for a urine sample. Defendant told the nurse he could not afford any tests and needed to leave the hospital as his daughter was out in the parking lot. Defendant removed all monitors and IV's, got dressed and ran out of the hospital.
4. Trooper Quiroga testified that he arrived at the hospital shortly before the defendant left; however, the Trooper was unaware the defendant was running away from the hospital and did not have the opportunity to speak with the defendant before he fled. At no time was the defendant placed under arrest.
5. Hospital staff told Trooper Quiroga that they had Defendant's blood. Trooper Quiroga testified that he told the hospital not to destroy the blood and proceeded to obtain a Grand Jury Subpoena from the Bee County District Attorneys' Office to gain possession of Defendants' blood.
6. Upon presentation of the Grand Jury Subpoena, the Hospital released Defendant's blood (four vials of blood) to an agent of The Department of Public Safety, Trooper Keese. The Hospital's representative testified as to their lab procedures and stated that the Hospital had no policy in place to show a chain of custody on the vials of blood. There was no documentation as to the chain of custody for the vials of blood while in the Hospital's care and control. It was testified to that the blood was not tested by the Hospital and there were no medical records indicating a test of the drawn blood.
7. Upon receipt of the vials of Defendant's blood, Trooper Keese immediately placed it in a DPS box (standard DPS blood kit) and mailed it, using the U.S. Postal Service, to the DPS lab in Austin, Texas for testing.
Order on Def.'s Mot. to Suppress, Clerk's R. 8, 8-9. The trial court's written conclusions of law stated:
1. The Court finds the seizure of the Defendant's blood from the Hospital and subsequent search of that blood by the DPS lab constitute a search and seizure within the scope of the Fourth Amendment of the United States Constitution and Article 1, Section 9 of the Texas Constitution.
2. The initial seizure of Juan Martinez's blood from the Hospital by the *283 State using a Grand Jury Subpoena was a valid seizure. However,
3. The search of the blood was performed without the necessary search warrant. The blood had been drawn and was no longer subject to mutation or metabolization. Further, the blood was in the possession of the DPS and not subject to destruction. There were no exigent circumstances to justify a search of the blood without a warrant.
4. The search of the blood, and the subsequent blood test results, are found to be inadmissible at this time.
Id. at 10 (emphasis in original). The State appealed the ruling, arguing that the trial court's decision was contrary to our opinion in State v. Huse and that the State's acquisition and testing of the blood did not constitute a Fourth Amendment search. State v. Martinez , 534 S.W.3d 97, 100 (Tex. App.-Corpus Christi-Edinburgh 2017). The court of appeals disagreed with the State and upheld the trial court's ruling, holding that the warrantless search of Appellee's blood sample violated the Fourth Amendment. Id. at 102. We granted the State's petition for discretionary review, which claimed that:
The Court of Appeals erred in holding that the trial court properly granted the defendant/appellee's motion to suppress evidence that revealed the results of testing of the blood of the defendant/appellee.
II - The Fourth Amendment
Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ...." U.S. CONST. amend. IV. The central concern underlying the Fourth Amendment is about giving police officers unbridled discretion to rummage at will among a person's private effects. Arizona v. Gant , 556 U.S. 332, 345, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009) ; State v. Rodriguez , 521 S.W.3d 1, 8-9 (Tex. Crim. App. 2017). A claim that the Fourth Amendment was violated may be based on a trespass theory of search, where one's own personal effects have been trespassed, or a privacy theory of search, where one's own expectation of privacy was breached. Rodriguez , 521 S.W.3d at 9 ; Ford v. State , 477 S.W.3d 321, 328 (Tex. Crim. App. 2015). Under the privacy theory, a person has standing to contend that a search or seizure was unreasonable if (1) he has a subjective expectation of privacy in the place or object searched, and (2) society is prepared to recognize that expectation as reasonable or legitimate. Ford , 477 S.W.3d at 328 ; State v. Granville , 423 S.W.3d 399, 405 (Tex. Crim. App. 2014).
III - Comeaux , Hardy , and Huse
Before the court of appeals, the State argued that our decisions in State v. Hardy and State v. Huse dictated that Appellee could have no expectation of privacy subject to Fourth Amendment protection in the vials containing samples of blood. Martinez , 534 S.W.3d at 100 (quoting and construing State's argument based on State v. Hardy , 963 S.W.2d 516 (Tex. Crim. App. 1997), and State v. Huse , 491 S.W.3d 833 (Tex. Crim. App. 2016) ). The court of appeals, however, found those cases distinguishable and instead relied upon an earlier plurality opinion, State v. Comeaux . Id. at 101 (discussing State v. Comeaux , 818 S.W.2d 46 (Tex. Crim. App. 1991) ). Finding Comeaux persuasive, the court of appeals held that the State's testing of Appellee's blood constituted a search subject to the Fourth Amendment, and a warrant was required before the State could test it. Id. at 102.
*284 Before this Court, the State argues that both the trial court and the court of appeals failed to adequately take into account Hardy and Huse . The State also contends that the court of appeals improperly relied upon Comeaux , which the State claims is inapplicable because it fails to properly account for Supreme Court precedent and is otherwise distinguishable. Accordingly, we begin with a review of these three cases.
In Comeaux , we addressed what is essentially the same question before the Court today. Comeaux was involved in a traffic accident and was taken to a hospital for treatment. Comeaux , 818 S.W.2d at 48. At the hospital, a sample of his blood was taken for medical purposes. Id. at 48-49. Tests done on the blood did not include analysis for blood alcohol content. Id. at 49. The DPS trooper investigating the accident wanted a sample of blood from Comeaux, even though there was no suspicion that Comeaux had consumed any alcohol and the trooper did not believe Comeaux was intoxicated at the time of the accident. Id. at 48. The State obtained the sample and tested it at the DPS laboratory. Id. at 49, 50-51. The trial court, the court of appeals, and a plurality of this Court concluded that Comeaux's Fourth Amendment right was violated.[1] Id. at 48, 53. Because Comeaux was a plurality opinion, it did not establish binding precedent. Hardy , 963 S.W.2d at 519. Thus, the question of whether the State's testing of blood constituted a Fourth Amendment search remained unanswered.
Six years later in Hardy , the issue involved blood that was not only drawn by the hospital, but also tested by the hospital for blood alcohol content. Id. at 518. The State did not obtain the blood in order to test it; instead, the State sought the hospital's test results. Id. at 523-24. Unlike Comeaux , which required a warrant to obtain and test the blood itself, we reached a different conclusion as to the scope of the Fourth Amendment as far as the results of testing were concerned, and we held that the results were not protected by the Fourth Amendment. Id. at 527. Along the way, we noted that where the drawing of blood is instigated by the government, a subsequent analysis of the blood by government agents also constitutes an invasion of a societally recognized expectation of privacy. Id. at 523 (citing Skinner v. Ry. Labor Execs.' Ass'n , 489 U.S. 602, 616, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) ). We identified three different stages regarding Hardy's expectation of privacy:
With regard to the blood alcohol test results, [Hardy's] expectations of privacy could potentially have been implicated at three different stages: (1) the physical intrusion into his body to draw blood, (2) the exercise of control over and the testing of the blood sample, and (3) obtaining the results of the test. But in the first two stages, [Hardy's] expectation of privacy had already been frustrated by the actions of nongovernmental agents. The physical intrusion occurred and the blood was tested by *285 medical personnel for medical purposes. While [Hardy] definitely possessed a privacy interest in the former, see Skinner (cited above), and may have possessed a privacy interest in the latter, see Comeaux (plurality opinion, cited above), those interests were frustrated by the actions of medical personnel. The only question remaining is whether [Hardy] had a reasonable expectation of privacy at the third stage-his test results.
Id. at 526. On the one hand, we recognized that a blood analysis by the State itself constitutes a search. Id. at 523 (citing Skinner ). Yet, on the other hand, we held back from affirming Comeaux when we qualified that there "may" be a privacy interest in the second Hardy category, the exercise of control over and the testing of the blood sample. Id. at 526.
Though Hardy held that the State's acquisition of the test results did not violate a legitimate expectation of privacy, we made sure to narrow that holding. We explicitly expressed no opinion concerning whether society recognized a reasonable expectation of privacy in medical records in general. Id. at 527. Instead, we noted that whatever interest society may have in safeguarding the privacy of medical records, that interest was not sufficiently strong to require the protection of the results of blood-alcohol testing performed by hospital personnel solely for medical purposes after a traffic accident. Id.
After Hardy was decided, HIPAA was enacted, and we granted review in Huse to determine whether the federal legislation changed the result of Hardy . Huse , 491 S.W.3d at 835. We determined that HIPAA did not, and we reaffirmed Hardy 's holding. Id. at 836, 842. In our discussion of Hardy , we explained that Hardy explicitly recognized that when the State itself extracts blood from a DWI suspect, and when the State conducts the subsequent blood alcohol analysis, two discrete "searches" have occurred for Fourth Amendment purposes. Id. at 840. Unlike in Hardy , in which we withheld any opinion about an expectation of privacy in medical records in general, because the impact of HIPAA was at issue in Huse , we stated that "[w]e have no doubt that HIPAA might support a broader claim that society now recognizes (if it did not already) that a patient has a legitimate expectation of privacy in his medical records in general ." Id. at 841. However, that broader claim-an expectation of privacy in medical records in general-was not at issue in Huse . Id. at 842.
Accordingly, after Hardy and Huse , it is well-settled that the State does not need to obtain a warrant to obtain the results of blood-alcohol testing by a hospital, performed for medical purposes, following a traffic accident. However, the continuing validity of Comeaux , representing Hardy 's second category, remained unaddressed. Thus, the case before the Court offers us either the opportunity to reaffirm Comeaux or to reject Comeaux and declare that once a hospital draws a patient's blood for medical purposes, that patient loses any expectation of privacy in whatever private facts may be revealed by the State's later testing of that blood.
IV - A Subjective Expectation of Privacy in a Blood Sample
On the question of whether Appellee had a subjective expectation of privacy in the first place, the State points out that there is no record evidence affirmatively showing that Appellee had such an expectation. The State then conclusively deems, without further explanation, Appellee's act of leaving the hospital as an abandonment and surrender of the blood. Implicitly, the State's argument appears to be that Appellee *286 abandoned the blood by leaving the hospital, and he therefore did not have a subjective expectation of privacy in the blood.
We have held that no person can reasonably expect privacy in property he abandons. Matthews v. State , 431 S.W.3d 596, 608 (Tex. Crim. App. 2014). When a defendant voluntarily abandons property, he lacks standing to contest the reasonableness of the search of the abandoned property. Swearingen v. State , 101 S.W.3d 89, 101 (Tex. Crim. App. 2003). The issue is not determined in the strict property-right sense but rather centers on whether the person voluntarily discarded, left behind, or otherwise relinquished his or her interest in the property so that he or she could no longer retain a reasonable expectation of privacy with regard to it at the time of the search. McDuff v. State , 939 S.W.2d 607, 616 (Tex. Crim. App. 1997). Thus, merely discarding property is not synonymous with abandonment. Matthews , 431 S.W.3d at 608-09. Abandonment is primarily a question of intent to be inferred from words spoken, acts done, and other objective facts and relevant circumstances. McDuff , 939 S.W.2d at 616. Abandonment consists of two components: (1) a defendant must intend to abandon property, and (2) a defendant must freely decide to abandon the property. Comer v. State , 754 S.W.2d 656, 659 (Tex. Crim. App. 1986) ; Matthews , 431 S.W.3d at 609. Even if a defendant intended to abandon the property, such abandonment is not freely made-it is not voluntary-if it is the product of police misconduct. Matthews , 431 S.W.3d at 609. When police take possession of property abandoned independent of police misconduct, there is no seizure under the Fourth Amendment. McDuff , 939 S.W.2d at 616.
Appellee, in response to the State's argument, claims that the record shows he had an expectation of privacy in the blood. Appellee argues that he refused to have his blood tested by the hospital. Appellee next argues that his act of leaving the hospital was not an act of abandonment because, even though he left the blood behind, most patients upon leaving the hospital are not offered an opportunity to take their blood samples with them. Additionally, Appellee points out that he did not sign any forms relinquishing the hospital's obligation to keep his blood private. Furthermore, Appellee contends that the State's argument, that the record lacks evidence showing an expectation of privacy, reverses the burden and evidentiary showing required.
Appellee is correct on that point-the test for abandonment in the Fourth Amendment context requires affirmative proof of abandonment. "To make the determination of voluntary abandonment we must determine if appellant intended to abandon." Comer , 754 S.W.2d at 659. The test does not begin with a presumption of abandonment which must be rebutted by proof of an intent not to abandon. However, the State is correct that there is some evidence which indicates that Appellee intended to abandon the blood. Appellee left the hospital and, consequently, left his blood behind. Additionally, Appellee's act of leaving was not instigated by police misconduct; he left before police had any chance to interact with him at all.
Although Appellee's act of leaving the hospital is an indicator that he also intended to abandon the blood, there is evidence in the record from which an inference can be drawn that there was no such intent. The trial court found that Appellee told the nurse that he could not afford any tests. This is supported by the record. Nurse Cynthia Wolfe noted, in Appellee's medical records, that Appellee "states that he does not have money to pay for ordered *287 tests." From this statement, it can be inferred that Appellee did not want tests to be performed. Appellee told the nurse he could not pay because he did not want to be charged, and he would not be charged unless tests were performed. This tends to show that he did not intend to completely surrender all decision-making authority over the blood. It implies that he intended to exercise at least some level of control over the blood's disposition.
Additionally, "[n]ot only will privacy expectations vary with the type of property involved ... but they will vary with the location of the property." United States v. Oswald , 783 F.2d 663, 666-67 (6th Cir. 1986) ; accord United States v. Most , 876 F.2d 191, 196 (D.C. Cir. 1989) ("Abandonment may be demonstrated, for example, when a suspect leaves an object unattended in a public place."); see, e.g. , Willis v. State , 518 S.W.2d 247, 249 (Tex. Crim. App. 1975) (billfold taken in robbery deemed abandoned because it was left in a steel drum used by all tenants of defendant's apartment building). In this case, Appellee left the blood in the possession of the hospital, which witnesses testified would not have turned over the blood to any person absent a court order. This is a far cry from leaving the blood in a public place accessible to anybody. As we "cogently stated" in Comeaux ,[2] "[c]ommon sense dictates, in this age of blood testing for everything from HIV infection to drug use, that a person does not assume that, by giving a sample of blood for private testing, that blood sample could then be submitted to the State, or to any other person or entity, for a purpose other than that for which it was given." Comeaux , 818 S.W.2d at 52. We conclude there is insufficient evidence showing that Appellee intentionally abandoned the blood, and there is some evidence showing that he harbored a subjective expectation of privacy in the blood.
V - Whether an Expectation of Privacy in Drawn Blood is Reasonable
V(A) - Third Party Doctrine
The State's brief, instead of addressing whether society would or would not consider an expectation of privacy in the drawn blood to be reasonable, argues that whatever expectation of privacy Appellee may have had was defeated by the third party doctrine. The State quotes the following passage from United States v. Jacobsen :
It is well settled that when an individual reveals private information to another, he assumes the risk that his confidant will reveal that information to the authorities, and if that occurs the Fourth Amendment does not prohibit governmental use of that information. Once frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmental use of the now-nonprivate information.
United States v. Jacobsen , 466 U.S. 109, 117, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). The State's brief does not provide any further explanation or argument as to how or why the quoted language applies in this case.
The quoted language from Jacobsen summarizes what is known as the "third-party doctrine." Ford , 477 S.W.3d at 329. Under the third-party doctrine, a person has no legitimate expectation of privacy in information voluntarily turned over to third parties.
*288 Carpenter v. United States , --- U.S. ----, 138 S.Ct. 2206, 2216, 201 L.Ed.2d 507 (2018) ; Love v. State , 543 S.W.3d 835, 841 (Tex. Crim. App. 2016). This is so even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed. United States v. Miller , 425 U.S. 435, 443, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) ; Ford , 477 S.W.3d at 329.
To the extent that the State relies upon the third party doctrine to argue that whatever privacy interest Appellee may have had in his blood was defeated by the doctrine, we find that the doctrine is inapplicable in this case. The third party doctrine has consistently been defined as involving a voluntary turnover of information to a third party. See, e.g. , Carpenter , 138 S.Ct. at 2220 (declining to extend the third-party doctrine to cell site location information due to lack of voluntariness, because "[c]ell phone location information is not truly 'shared' as one normally understands the term.").
In this case, there is a distinct lack of voluntariness on Appellee's part. Appellee did not go to the hospital of his own volition; he was taken there by an ambulance after the traffic accident. Although according to nurse Cynthia Wolfe's affidavit Appellee gave consent to be treated, Wolfe's notes in Appellee's medical records indicate that the only treatment Appellee wanted was for his hand to be looked at. Wolfe's notes and affidavit further indicate that Appellee was uncooperative, he repeatedly tried to remove monitors, he asked for the IV to be removed, he stated that he could not pay for any testing (implying that he did not want any testing done), and that he needed to leave. Nurse Gary Calloway, who performed the blood draw, testified that he had no memory of treating Appellee, but he assumed Appellee had given implied consent for the blood draw, because Calloway had no documentation with him at the suppression hearing indicating that Appellee refused. However, Calloway cautioned that implied consent is not possible if a patient is incoherent. Calloway did not remember if Appellee was coherent or incoherent. The trial court, in its findings, determined that Appellee was not entirely coherent. This finding is supported by Wolfe's affidavit which states that Appellee appeared to be in an altered mental state and made a number of nonsensical statements.
From this record, there is no evidence that Appellee voluntarily gave his blood to be tested. Calloway had no recollection of this case and could only assume that Appellee gave implied consent due to the lack of paperwork showing a refusal. Against this assumption are Appellee's not entirely coherent state of mind, which Calloway testified would make implied consent impossible; Appellee's uncooperative demeanor; his desire that only his hand be looked at; his request to have the IV removed; his repeated attempts to remove monitors; his statement that he could not pay for testing (implying that he did not want testing done); his statement that he needed to leave; and his actual successful departure from the hospital. These facts indicate that the surrender of blood to the hospital was not the result of a voluntary choice by Appellee, and the third party doctrine is inapplicable.
V(B) - Private Facts in Blood
To support his argument that society would consider an expectation of privacy in blood as legitimate, Appellee points to the United States Supreme Court's opinion in Birchfield v. North Dakota , in which the Supreme Court examined warrantless breath and blood testing incident to arrest for drunk driving.
*289 Birchfield v. North Dakota , --- U.S. ----, 136 S.Ct. 2160, 195 L.Ed.2d 560 (2016). The Supreme Court held that warrantless breath testing incident to arrest was permissible, but warrantless blood testing incident to arrest was prohibited by the Fourth Amendment. Id. at 2184. In reaching these separate conclusions, the Court emphasized the limited scope of information that could be obtained from a breath test:
[B]reath tests are capable of revealing only one bit of information, the amount of alcohol in the subject's breath. In this respect, they contrast sharply with the sample of cells collected by the swab in Maryland v. King . Although the DNA obtained under the law at issue in that case could lawfully be used only for identification purposes ... the process put into the possession of law enforcement authorities a sample from which a wealth of additional, highly personal information could potentially be obtained. A breath test, by contrast, results in a BAC reading on a machine, nothing more.
Id. at 2177. As for the scope of information that could be obtained from a blood test:
[A] blood test, unlike a breath test, places in the hands of law enforcement authorities a sample that can be preserved and from which it is possible to extract information beyond a simple BAC reading. Even if the law enforcement agency is precluded from testing the blood for any purpose other than to measure BAC, the potential remains and may result in anxiety for the person tested.
Id. at 2178.
Maryland v. King , which the Birchfield Court referred to, upheld the State of Maryland's booking procedure of taking DNA samples, through the use of oral buccal swabs, from certain arrestees. Maryland v. King , 569 U.S. 435, 465-66, 133 S.Ct. 1958, 186 L.Ed.2d 1 (2013). After first holding that the search using the buccal swabs to obtain the DNA samples from the arrestees in the first instance was reasonable under the Fourth Amendment, the Court held that the subsequent analysis of the arrestees' DNA samples also did not violate the Fourth Amendment. Id. at 464, 133 S.Ct. 1958. Important to the Court's holding was the fact that the analysis was specifically tailored to identifying the arrestees and could not reveal genetic traits and were unlikely to reveal any private medical information. Id. The Court cautioned, however, that, "[i]f in the future police analyze samples to determine, for instance, an arrestee's predisposition for a particular disease or other hereditary factors not relevant to identity, that case would present additional privacy concerns not present here." Id. at 464-65, 133 S.Ct. 1958.
Birchfield 's concerns over the government's access to personal information that could be learned through testing biological samples were similarly raised in the earlier case of Skinner v. Railway Labor Executives' Association , in which the issue before the Court involved regulations promulgated by the Federal Railroad Administration governing blood and urine testing of railroad employees. Skinner , 489 U.S. at 606, 109 S.Ct. 1402. Labor organizations filed suit to enjoin enforcement of those regulations, claiming that the testing violated their privacy interests under the Fourth Amendment. Id. at 612, 109 S.Ct. 1402. On certiorari, the Supreme Court agreed that the Fourth Amendment was implicated. Id. at 615-16, 109 S.Ct. 1402. In regards to blood testing, the Court reiterated that not only does the physical intrusion, penetrating beneath the skin, to acquire blood infringe an expectation of privacy that society is prepared to recognize as reasonable, but also "[t]he ensuing chemical analysis of the sample to obtain *290 physiological data is a further invasion of the tested employee's privacy interests." Id. at 616, 109 S.Ct. 1402. As for urine testing, the Court acknowledged that unlike blood testing, collecting and testing urine samples did not involve a surgical intrusion into the body. Id. at 617, 109 S.Ct. 1402. However, the Court nevertheless came to the "conclusion that the collection and subsequent analysis of the requisite biological samples must be deemed Fourth Amendment searches." Id. at 618, 109 S.Ct. 1402. The Supreme Court had two reasons for this conclusion. First, "chemical analysis of urine, like that of blood , can reveal a host of private medical facts about an employee, including whether he or she is epileptic, pregnant, or diabetic." Id. at 617, 109 S.Ct. 1402 (emphasis added). Second, it was indisputable that the process of collecting urine samples, "which may in some cases involve visual or aural monitoring of the act of urination," implicated privacy interests. Id. The Supreme Court thus concluded that "[b]ecause it is clear that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable, the Federal Courts of Appeals have concluded unanimously, and we agree, that these intrusions must be deemed searches under the Fourth Amendment." Id. ; see also Vernonia School Dist. 47J v. Acton , 515 U.S. 646, 658, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) ("The other privacy-invasive aspect of urinalysis is, of course, the information it discloses concerning the state of the subject's body, and the materials he has ingested."); Ferguson v. City of Charleston , 532 U.S. 67, 76, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001) ("the urine tests conducted by those staff members were indisputably searches within the meaning of the Fourth Amendment").
Other courts dealing with biological samples have come to similar conclusions. See McDonell v. Hunter , 612 F.Supp. 1122, 1127 (S.D. Iowa 1985), aff'd as modified , 809 F.2d 1302, 1304, 1310 (8th Cir. 1987) ("One does not reasonably expect to discharge urine under circumstances making it available to others to collect and analyze in order to discover the personal physiological secrets it holds, except as part of a medical examination. It is significant that both blood and urine can be analyzed in a medical laboratory to discover numerous physiological facts about the person from whom it came, including but hardly limited to recent ingestion of alcohol or drugs. One clearly has a reasonable and legitimate expectation of privacy in such personal information contained in his body fluids.").
We agree with Appellee's argument that the Supreme Court considers the analysis of biological samples, such as blood, as a search infringing upon privacy interests subject to the Fourth Amendment. The second category we recognized in Hardy , the State's exercise of control over and testing of a blood sample, constitutes a search. This is consistent not only with the privacy concerns mentioned by the Supreme Court in Birchfield and Skinner , but also with Skinner 's characterization that chemical analysis was a "further" invasion of privacy interests and that collection and testing were "intrusions" (plural) that constituted "searches" (plural). Skinner , 489 U.S. at 616, 617, 109 S.Ct. 1402 ; see also Huse , 491 S.W.3d at 840 (State's blood alcohol analysis is a separate search discrete from State's drawing of blood).
It is also consistent with the Supreme Court's views on the continuing interest in privacy in containers, such as cellular phones, that are validly in the possession of police that may yield medical information about a person.
*291 Riley v. California , 573 U.S. 373, 134 S.Ct. 2473, 2490, 189 L.Ed.2d 430 (2014) (in holding that a warrant is required to search a cell phone, considering the qualitative information stored in the phone as implicating private interests or concerns, such as medical information implied by internet searches for certain symptoms of disease coupled with frequent visits to WebMD); see also Granville , 423 S.W.3d at 408 (in which we held a person has a legitimate expectation of privacy in the contents of his cellular phone, because of its ability to contain a large amount of data involving intimate details of an individual's life, including medical information).
Based on the foregoing, we believe the Comeaux plurality reached the correct result twenty-eight years ago when it considered the question we are faced with today. There are private facts contained in a sample of a person's blood beyond simple confirmation of a suspicion that a person is intoxicated. These private facts are those that a person does not voluntarily share with the world by the mere drawing of blood and may be subject to Fourth Amendment protection. We hold that there is an expectation of privacy in blood that is drawn for medical purposes. The expectation is not as great as an individual has in the sanctity of his own body against the initial draw of blood. Missouri v. McNeely , 569 U.S. 141, 148, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013) (compelled physical intrusion beneath the skin and into the veins to obtain a sample of blood for use as evidence in a criminal investigation "implicates an individual's 'most personal and deep-rooted expectations of privacy.' ") (quoting Winston v. Lee , 470 U.S. 753, 760, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985) ); Hardy , 963 S.W.2d at 526. But it is greater than an individual has in the results of tests that have already been performed on the blood. Individuals in the latter case have, as we held in Hardy and Huse , no expectation of privacy. Hardy , 963 S.W.2d at 527 ; Huse , 491 S.W.3d at 842.
V(C) - HIPAA and the Privacy of Health Information
Appellee also argues that the existence of federal and state privacy laws governing the disclosure and transmission of health information, such as HIPAA, reflects a societal view that health information is private, and, therefore, Appellee's subjective expectation of privacy in his blood is reasonable.
Appellee's argument is well-taken, and we said in Huse that HIPAA might support a broader claim that society recognized that a patient has a legitimate expectation of privacy in his medical records in general. Huse , 491 S.W.3d at 841 ; see also Comeaux , 818 S.W.2d at 53 (finding the Texas Medical Practice Act as evidence of society's regard for an expectation of privacy in the blood sample at issue in that case).[3] Indeed, at the hearing, the witnesses from the hospital testified that they would not simply hand over medical records or the blood to any person, and they would not do so to members of law enforcement without a court order. However, Appellee did not challenge the acquisition of his medical records, and HIPAA, which aims to protect identifiable health information *292 as contained in medical records, is silent as to the protection of biological samples such as the vials of Appellee's blood at issue in this case. Yet, this difference does not undermine the basic notion that HIPAA represents a societal expectation that private health information will generally be kept private. To the extent that a vial of blood contains private health information about a person, HIPAA's protection of private health information as contained in medical records is simply a factor indicating that society would consider reasonable an expectation of privacy in the blood itself.
VI - Conclusion
In this case, medical staff at the hospital performed a private search by beginning trauma procedures and drawing Appellee's blood for medical purposes. The government's actions consisted of subjecting Appellee's blood to testing at the DPS laboratory. As discussed above, testing itself constitutes a search, and this search was not done by the hospital. Appellee's privacy interest vis-a-vis the contents of the blood-the blood's "informational dimension"[4] -had not been frustrated by the actions of the hospital. The State, and only the State, tested and therefore searched the blood, and, ipso facto , the government search went beyond the scope of the private search. See Jacobsen , 466 U.S. at 115, 104 S.Ct. 1652 ; Walter v. United States , 447 U.S. 649, 657, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980).
We hold that there is a Fourth Amendment privacy interest in blood that has already been drawn for medical purposes. In this case, Appellee had a subjective expectation of such a privacy interest in his blood, and the State's subsequent testing of the blood was a Fourth Amendment search separate and apart from the seizure of the blood by the State. Because no exception to the warrant requirement applied, the State was required to obtain a warrant before testing Appellee's blood. The trial court properly granted Appellee's motion to suppress, and the court of appeals correctly affirmed. We therefore affirm the judgment of the court of appeals.
Keller, P.J., and Yeary and Newell, JJ., concurred in the result.

Judge Maloney delivered the plurality opinion, joined by Judges Clinton, Overstreet, and Baird. Judges Miller and White concurred in the result. Comeaux , 818 S.W.2d at 53. Judge Campbell filed a concurring opinion, joined by Judge Benavides, in which he argued that the seizure and search of the blood violated statutory protections for physician-patient communications. Id. at 54 (Campbell, J., concurring). As for the plurality's Fourth Amendment-based opinion, Judge Campbell found it unnecessary and likely incorrect. Id. Presiding Judge McCormick's dissenting opinion directly argued that the plurality's Fourth Amendment-based opinion was incorrect due to the applicability of the third-party doctrine, in which a person loses any privacy interest in information voluntarily given to a third party. Id. at 56 (McCormick, P.J., dissenting).

1 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.6(b) (5th ed. 2012) (discussing Comeaux in the context of abandonment).

In a different context, the existence of ordinances governing taxicab passengers' rights to the passenger compartment was a social or legislative fact helpful in resolving the constitutional question of whether society recognized an asserted expectation of privacy in a taxicab passenger compartment as a reasonable one. Chapa v. State , 729 S.W.2d 723, 728 n.3 (Tex. Crim. App. 1987). "A clearer indicium of society's preparedness to accept as reasonable an expectation of privacy in the passenger compartment of a taxicab could hardly be imagined." Id. at 728.

Granville , 423 S.W.3d at 426 (Keller, P.J., concurring).