

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-24-00162-CR

———————————————

DAVID LEE JACKSON, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 271st District Court
Wise County, Texas
Trial Court No. CR24164

---

Before Kerr, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

Appellant David Lee Jackson appeals his conviction, enhanced by two prior felony convictions, and his 20-year sentence imposed after a jury found him guilty of possession with an intent to deliver more than four grams but less than 200 grams of a controlled substance (methamphetamine). In the first two of his three points on appeal, Jackson challenges whether the arresting officer had reasonable suspicion to stop his car and to then continue the detention to wait for a drug dog. In the third, Jackson questions whether—constitutionally speaking—the drug dog's "sniff [was] up to snuff,"[1] claiming the dog's nose had "trespassed" inside his vehicle's window, thus violating his right to be free from an unreasonable search and seizure. We will affirm.

### I. Pertinent Factual Background and Procedural History

On February 5, 2022, Deputy Chandler Works, who then worked for the Wise County Sheriff's Office, saw a black Chevrolet Blazer on Highway 380. Deputy Works observed the Blazer "all of a sudden start to veer off of its lane," which caught his attention. He also saw the Blazer begin "to bounce off the solid white fog line," which to him indicated the driver was "looking back [and] not paying attention."

As Deputy Works got closer to the Blazer, he noticed "a Texas paper license plate that flopped up, and whenever it flopped up, [he] saw another exposed Texas license plate" underneath, which he believed violated the administrative and

---

[1]*See Florida v. Harris*, 568 U.S. 237, 248, 133 S. Ct. 1050, 1058 (2013).

transportation codes. Deputy Works pulled the Blazer over and confirmed that both temporary tags were expired.

During the traffic stop, Deputy Works identified Jackson as the Blazer's driver and decided to give him a warning for the expired tags. According to Deputy Works, when he spoke with Jackson, Jackson appeared nervous, stuttered, smoked two cigarettes, looked down, and did not make eye contact.[2] Deputy Works asked dispatch to run Jackson's criminal history, which showed 15 previous arrests, including for assault and marijuana possession. When Deputy Works asked Jackson about his criminal history, Jackson was not truthful in his responses.

At one point, Deputy Works asked to search the Blazer, but Jackson would not consent. So around fourteen minutes into the stop, Deputy Works called for a drug dog to conduct an open-air sniff. Approximately twenty-six minutes later, Deputy Logan Fry, a canine handler, and his dog Rio arrived. Deputy Fry performed a "safety check" around the Blazer, ensuring that there were no ground hazards; he then got Rio.

---

[2]At trial and on appeal, Jackson's counsel suggested that Jackson is blind in one eye. But Jackson did not testify at trial, and he put on no evidence regarding his eyesight. Counsel's questions about whether Deputy Works was aware that Jackson is blind in his right eye, and Deputy Works's "no" responses, are not evidence that Jackson has an eye condition. *See Haley v. State*, 396 S.W.3d 756, 767 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("It is well-settled that attorney questions are not evidence." (citing *Madden v. State*, 242 S.W.3d 504, 513 & n.23 (Tex. Crim. App. 2007))).

Deputy Fry testified that Rio had been trained to sit down when she "alerted"—that is, detected the smell of drugs. Deputy Fry led Rio around the outside of the Blazer, at times using his hand to direct her where to sniff. At both the front passenger's door and the driver's door, Deputy Fry directed her to sniff higher. Deputy Fry testified that he was "not telling her to touch the vehicle . . . [or] telling her to even jump"; rather, he "want[ed] her to sniff higher."

Each time Deputy Fry directed Rio to a window—twice at the driver's door and once at the front passenger's door—she stood up on her back legs. Deputy Works's dash-camera and body-camera footage does not clearly or conclusively show whether (1) Rio's front paws touched the Blazer or (2) her nose went inside either window. Each window encounter lasted around one second.

Deputy Fry could not recall whether Rio touched the Blazer, but he said, "[W]e don't direct the dog to touch the vehicle." And although Deputy Fry agreed that his report stated that Rio was "sniffing in the window," he clarified that he "didn't mean [she] physically enter[ed] the window"; he testified unequivocally that "she never entered the vehicle."

After sniffing at the driver's side window a second time, Rio sat down, indicating that she had detected drugs. Deputy Works then searched the Blazer and discovered a cylindrical container holding multiple baggies of a clear crystal-like substance, which later testing confirmed to be 6.96 grams of methamphetamine. Deputy Works arrested Jackson, and he was eventually brought to trial.

4

Jackson did not file a pretrial motion to suppress. Instead, on the first day of trial, during Deputy Works's testimony, Jackson objected to the traffic stop and his prolonged detention. The trial court conducted a hearing on Jackson's motion and denied it. During Deputy Works's testimony, the trial court admitted all of the State's exhibits (including the cylinder container, bags of methamphetamine, and cash discovered in the search), except for a DPS lab analysis report.[3]

Deputy Fry testified on the second day of trial. As he testified about his report and whether Rio had entered the Blazer to sniff, Jackson objected that the dog sniff had violated his Fourth Amendment rights because the dog had trespassed into the Blazer. The trial court overruled that objection, and trial continued. After the State rested its case-in-chief, Jackson reurged his suppression motion based on the "original reason for the traffic stop and the continued prolonged detention," and the trial court again overruled it.

## II. The Reasonable Suspicion to Detain Jackson and Continue the Detention

In his first two points, Jackson argues that the trial court erred by denying his motion to suppress Deputy Works's testimony and the evidence he obtained in searching Jackson's Blazer. Jackson challenges whether Deputy Works had reasonable suspicion first to pull Jackson over and second to continue the detention to give the drug dog time to arrive after initially deciding to give Jackson a warning.

---

[3]When the lab report was admitted on the second day of trial, Jackson stated that he had "no objections."

## A.    Standard of Review

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *State v. Martinez*, 570 S.W.3d 278, 281 (Tex. Crim. App. 2019). Because the trial judge is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony, *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007), we defer almost totally to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on evaluating credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor, *Martinez*, 570 S.W.3d at 281. Whether the totality of circumstances supports reasonable suspicion is a legal determination we review de novo. *State v. Sheppard*, 271 S.W.3d 281, 291 (Tex. Crim. App. 2008).

When the record is silent on the reasons for the trial court's ruling, or when there are no explicit factual findings and neither party timely requested findings of fact and conclusions of law from the trial court, we infer the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013); *State v. Kelly*, 204 S.W.3d 808, 818–19 (Tex. Crim. App. 2006). We then review the trial court's legal ruling de novo unless the implied fact findings supported by the record are also dispositive of the legal ruling. *Kelly*, 204 S.W.3d at 819.

6

## B.     The Initial Detention

An officer may initiate a traffic stop if he has a reasonable basis for suspecting that a person has committed a traffic violation. *See Garcia v. State*, 827 S.W.2d 937, 944 (Tex. Crim. App. 1992). An officer has reasonable suspicion if he has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect that a particular person has been or soon will be engaged in criminal activity. *Jaganathan v. State*, 479 S.W.3d 244, 247 (Tex. Crim. App. 2015). "This is an objective standard that disregards the subjective intent of the officer and requires only some minimal level of justification for the stop." *Brodnex v. State*, 485 S.W.3d 432, 437 (Tex. Crim. App. 2016).

In determining whether an officer has reasonable suspicion, we may not use a divide-and-conquer approach, in which we isolate or disregard individual circumstances as not being suspicious. *Furr v. State*, 499 S.W.3d 872, 880 n.8 (Tex. Crim. App. 2016) (citing *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015)). Rather, we must consider the cumulative force of all the circumstances. *Id.*

The Texas Administrative Code requires that "[a]ll printed information on a temporary tag must be visible and may not be covered or obstructed by any plate holder or other device or material." 43 Tex. Admin. Code § 215.151(b) (Tex. Dep't of Motor Vehicles, Temporary Tags, General Use, and Prohibitions); *see* Tex. Transp. Code Ann. § 503.069. Courts have held that "[a]n illegible temporary tag gives rise to the reasonable suspicion that the driver of the vehicle is displaying a tag that does not

7

comply with [the law]." *Pabst v. State*, 466 S.W.3d 902, 906 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (first citing *Green v. State*, 866 S.W.2d 701, 703 (Tex. App.—Houston [1st Dist.] 1993, no pet.); and then citing *Kennedy v. State*, 847 S.W.2d 635, 636 (Tex. App.—Tyler 1993, no pet.)); *see also Broadway v. State*, No. 05-17-00908-CR, 2018 WL 3121552, at *5 (Tex. App.—Dallas June 26, 2018, no pet.) (mem. op., not designated for publication).

To illustrate, in *Aguilar v. State*, the Dallas court held that an officer was justified in conducting a traffic stop where the vehicle's temporary tag was not secured, visible, or legible. No. 05-15-00535-CR, 2016 WL 1725481, at *2 (Tex. App.—Dallas Apr. 27, 2016, pet ref'd) (mem. op., not designated for publication). The officer testified that he had observed the defendant's unsecured rear paper license plate "flapping in the air," preventing him from reading any numbers or letters or the state of origin on the temporary plate. *Id.* Relying on the same law as the Fourteenth Court of Appeals did in *Pabst*, the Dallas Court of Appeals rejected Aguilar's argument that the investigator did not have reasonable suspicion to stop the vehicle. *Id.*

Here, Deputy Works testified that he saw Jackson's Blazer "all of a sudden start to veer off of [his] lane, which [is] not typical." He also testified that the Blazer "beg[an] to bounce off the solid white fog line, which is typically an indicator of someone looking back and not paying attention." Deputy Works sped up to the Blazer and observed the driver's "grabbing and retrieving something from the center console."

Deputy Works then noticed that there were two temporary tags on the back of Jackson's Blazer. He testified that the outer tag "was actually flopping" and would get "caught on the ball hitch," exposing another temporary tag beneath it. Asked whether he could see the second tag while going 60 miles per hour, Deputy Works stated, "It still makes the license plate illegible." He was eventually able to observe that both tags were expired. Deputy Works believed that Jackson's display of the two expired temporary tags—with one flapping in the wind—violated the law.

We conclude that Deputy Works testified to specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that Jackson had engaged in criminal activity—using and displaying two expired tags, one of which was not secured—and that the officer had reasonable suspicion to lawfully stop Jackson's Blazer. *See id.*; *Pabst*, 466 S.W.3d at 906; *see also Enns v. State*, 612 S.W.3d 616, 627 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (holding that officer had reasonable suspicion even if his testimony did not establish a definitive transportation-code violation). The trial court thus did not err by denying Jackson's motion to suppress concerning the initial traffic stop. We overrule Jackson's first point.

## C.    The Continued Detention

During a traffic stop, an officer has the right to ask the driver for identification, a valid driver's license, information about the vehicle's ownership and registration, proof of insurance, and information about the destination and purpose of the trip.

9

*Kothe v. State*, 152 S.W.3d 54, 63 (Tex. Crim. App. 2004); *Caraway v. State*, 255 S.W.3d 302, 307 (Tex. App.—Eastland 2008, no pet.). The officer may also check for outstanding warrants and may conduct a computer check on that information. *Kothe*, 152 S.W.3d at 63. In addition, an officer may ask the driver about matters unrelated to the stop's purpose so long as the questioning does not measurably extend the stop's duration. *Lerma v. State*, 543 S.W.3d 184, 190 (Tex. Crim. App. 2018); *see also Rodriguez v. United States*, 575 U.S. 348, 355, 135 S. Ct. 1609, 1615 (2015).

An officer making a traffic stop need not investigate the situation in any particular order. *Kothe*, 152 S.W.3d at 65. But an officer's authority for the stop ends when tasks related to the traffic infraction are, or reasonably should be, completed. *Rodriguez*, 575 U.S. at 354–55, 135 S. Ct. at 1614–15; *see also Lerma*, 543 S.W.3d at 191. Only if the investigation "unduly prolongs" the detention is the officer's action unreasonable under the circumstances. *Kothe*, 152 S.W.3d at 63–64. But if an officer develops reasonable suspicion that a vehicle's occupant is involved in criminal activity, the officer may continue questioning the person regardless of whether the tasks related to the traffic stop have come to an end. *See Lerma*, 543 S.W.3d at 191; *see also Rodriguez*, 575 U.S. at 355, 135 S. Ct. at 1615; *Villarreal v. State*, 631 S.W.3d 198, 201 (Tex. App.—Houston [14th Dist.] 2020, no pet.).

Here, Deputy Works testified about his initial contact with Jackson as follows:

I introduced myself, requested his driver[']s license and proof of insurance. I was handed his driver's license, and I observed his hand was shaking quite a bit, which is a sign of nervousness, and I observed when

10

I'm talking to him he's actually stuttering and he's staring down. The only time he's making eye contact with me is when he's forced to make eye contact with me to hand me an item, whether it's his driver's license or insurance.

Whenever I inquired about traffic citations, he says, yes, I have. When I asked if he's ever been arrested before, he said, yes, but then won't tell me anything.

Although Deputy Works ultimately decided to issue a warning for the tags, as part of his traffic-stop investigation, he had requested that his dispatch run a criminal-history check for any previous narcotic-related arrests. Through that process, Deputy Works learned of Jackson's criminal history, which included assault and marijuana-possession charges.

Deputy Works then asked Jackson to step out of the Blazer and asked him about his criminal history. Deputy Works testified that Jackson answered deceptively. At that point, around fourteen minutes into the stop, Deputy Works called for a drug dog to conduct an open-air sniff. Deputy Fry and Rio arrived around twenty-six minutes later.[4]

---

[4]Jackson does not complain about the time it took for Rio to arrive, but such a length of time did not constitute a per se unreasonable delay or prolonging of the initial detention. *See Parker v. State*, 297 S.W.3d 803, 812 (Tex. App.—Eastland 2009, pet. ref'd) (holding that a 70-minute detention following a traffic stop until the canine alerted on the defendant's vehicle was not unreasonable per se); *Strauss v. State*, 121 S.W.3d 486, 492 (Tex. App.—Amarillo 2003, pet. ref'd) (same for 75 minutes); *Josey v. State*, 981 S.W.2d 831, 841 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd) (same for 90-minute detention from the time of the stop until officers searched the vehicle); *see also United States v. Sharpe*, 470 U.S. 675, 685–86, 105 S. Ct. 1568, 1575 (1985) (expressly rejecting the adoption of a "hard-and-fast" time limitation for permissible traffic stops).

Jackson maintains that his alleged nervousness was of little probative value and was "a weak indicator of hidden narcotics." *See McQuarters v. State*, 58 S.W.3d 250, 257 (Tex. App.—Fort Worth 2001, pet. ref'd). But we do not consider his nervousness in isolation. *See Furr*, 499 S.W.3d at 880 n.8; *Murray*, 457 S.W.3d at 448. Unlike McQuarters, who did not lie to the detaining officers or have any prior drug offenses, *see McQuarters*, 58 S.W.3d at 257, Jackson did have a prior drug charge, and he was not truthful in answering Deputy Works's questions about that charge.

The totality of the circumstances—including Jackson's nervousness (as Deputy Works observed from his shaking hand, stuttering, avoiding eye contact, and requesting and lighting cigarettes) combined with his deceptiveness about his prior criminal record—gave Deputy Works a substantial basis for concluding that Jackson was, had been, or soon would be involved in illegal narcotics activity. *See Hamal v. State*, 390 S.W.3d 302, 308 (Tex. Crim. App. 2012) ("Although nervousness alone is not sufficient to establish reasonable suspicion for an investigative detention, it can do so in combination with other factors.") (cleaned up). Accordingly, Deputy Works had reasonable suspicion to justify Jackson's continued detention for the drug dog's open-air sniff. *See id.*; *see also Johnson*, 622 S.W.3d at 388 ("[R]easonable suspicion is a less demanding standard than probable cause. It is a relatively low hurdle."). We hold that the trial court did not err by denying Jackson's motion to suppress concerning the continued detention, and we overrule his second point.

### III. The Dog Sniff

In his third point, Jackson argues that the trial court erred by overruling his objection to the admission of evidence obtained from Rio's open-air sniff because Rio trespassed on and into Jackson's vehicle by jumping onto, and sniffing inside the open window of, the Blazer. Jackson did not preserve error on this point.

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion stating the specific grounds, if not apparent from the context, for the desired ruling. Tex. R. App. P. 33.1(a)(1); *Thomas v. State*, 505 S.W.3d 916, 924 (Tex. Crim. App. 2016). Concerning the admission of evidence, a party must object as soon as the basis for the objection becomes apparent. Tex. R. Evid. 103(a)(1); *London v. State*, 490 S.W.3d 503, 507 (Tex. Crim. App. 2016); *Pena v. State*, 353 S.W.3d 797, 807 (Tex. Crim. App. 2011); *Reyes v. State*, 361 S.W.3d 222, 228–29 (Tex. App.—Fort Worth 2012, pet. ref'd); *see Lackey v. State*, 364 S.W.3d 837, 843–44 (Tex. Crim. App. 2012) (discussing policies underlying the timeliness requirement); *Saldano v. State*, 70 S.W.3d 873, 889 (Tex. Crim. App. 2002) ("We have consistently held that the failure to object in a timely and specific manner during trial forfeits complaints about the admissibility of evidence." (citations omitted)).

Jackson first complained about the open-air dog sniff on the second day of trial during Deputy Fry's testimony—after Deputy Works had finished testifying about his finding methamphetamine in the Blazer and after the trial court had admitted into evidence everything that Deputy Works had found during his vehicle search, including

the methamphetamine. During Deputy Fry's testimony, Jackson argued about whether Rio had trespassed into his Blazer, converting the open-air sniff into an unreasonable search and seizure. Jackson's counsel summed up his argument: "And for . . . those reasons, we'd ask for that evidence to be disregarded, your Honor, suppressed."

Jackson argues that "the trial court erred by denying [his] objection to the admission of the items discovered during the search following the free[-]air sniff." But by the time he objected to Rio's alleged trespass, the fruits Jackson wanted suppressed had already been admitted during Deputy Works's testimony. *See, e.g.*, *Teal v. State*, Nos. 02-21-00060-CR, 02-21-00061-CR, 02-21-00062-CR, 02-21-00063-CR, 2022 WL 2176515, at *10 (Tex. App.—Fort Worth June 16, 2022, no pet.) (mem. op., not designated for publication) (concluding that appellant failed to preserve his appellate complaints concerning the admission of evidence because he moved to suppress the evidence after the trial court had already admitted substantially the same evidence without objection); *Moore v. State*, No. 03-13-00792-CR, 2016 WL 3361477, at *3 (Tex. App.—Austin June 9, 2016, no pet.) (mem. op., not designated for publication) (holding that appellant failed to preserve error by moving to suppress drug evidence that had already been admitted); *see also In re R.A.*, Nos. 14-04-00863-CV, 14-04-01180-CV, 2006 WL 1735122, at *4 (Tex. App.—Houston [14th Dist.] June 27, 2006, no pet.) (mem. op.) ("Appellant's urging of his motion to suppress

after the evidence already had been admitted was too late to preserve error on this point."). We overrule Jackson's third point.

## IV. Conclusion

Having overruled Jackson's three points, we affirm the trial court's judgment of conviction.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: May 15, 2025