

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00271-CR

_____

ALVIN ARNOLD, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 462nd District Court
Denton County, Texas
Trial Court No. F22-3315-462

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

Appellant Alvin Arnold appeals his conviction for possession of a controlled substance with intent to deliver. *See* Tex. Health & Safety Code Ann. § 481.112(d). In one issue, Arnold asserts that the trial court erred by overruling his motion to suppress evidence obtained from a "vehicular tracking device" because there was no probable cause to issue the warrant under which the device was used. We affirm.

## I. Background

After receiving information from a confidential informant (CI) and another person called a "source of information" (SOI), officers with the Little Elm Police Department (LEPD) began investigating Arnold for cocaine possession and distribution. The CI had informed LEPD Detective Austen McKinney in April 2022 that "an individual named 'Alvin'" had been selling cocaine at bars in Little Elm, Texas, specifically at a bar called the End Zone. According to the CI, "Alvin" drove a white Ford F-150 pickup truck and sold cocaine at the End Zone for "a couple of hours" every night.

McKinney met with the SOI in May 2022.[1] The SOI, who had "been around Alvin" and had "seen him in possession of [c]ocaine," corroborated the CI's

---

[1]We note that McKinney's probable-cause affidavit places this meeting in "May 2020." Arnold relies on this statement to argue that the SOI's information was stale and thus unreliable to support the warrant. But Arnold failed to raise this issue with the trial court. Thus, he has failed to preserve the error for our review. *See* Tex. R. App. P. 33.1 *see also Lewis v. State*, No. 01-11-00399-CR, 2012 WL 682293, at *4 (Tex. App.—Houston [1st Dist.] Mar. 1, 2012, no pet.) (mem. op., not designated for

information and showed McKinney some text messages from "Alvin." According to McKinney, the text messages indicated that "Alvin" had sold cocaine. The SOI also gave McKinney "Alvin's" cell phone number.

Using that cell phone number, McKinney learned that "Alvin" was Alvin Arnold and obtained Arnold's race, sex, birthdate, driver's license number, and address in Celina, Texas. McKinney also found Arnold's public Facebook page on which Arnold had posted videos of himself and a white 2015 Ford F-150 pickup truck with temporary registration tags. Using the temporary registration number reflected in the video, McKinney confirmed that the truck was registered to Arnold at the same Celina address.

Based on McKinney's research and the CI's and SOI's information, the LEPD suspected Arnold of dealing cocaine. This suspicion was relayed to "Officer Fislar"[2]

publication) (holding that defendant who failed to complain to trial court about purportedly stale facts in probable-cause affidavit failed to preserve error for appeal).

Regardless, McKinney mitigated any staleness by verifying the SOI's information three days before the LEPD began surveilling Arnold. *See State v. Le*, 463 S.W.3d 872, 881 (Tex. Crim. App. 2015) (holding that police officer's verification of arguably stale information from anonymous informant provided probable cause for search warrant). Additionally, the May 2020 reference appears to be merely a typographical error because McKinney's affidavit presents events in chronological order and places the "May 2020" SOI meeting between the April 2022 CI meeting and McKinney's May 5, 2022 initial investigation using phone number provided by the SOI. McKinney also testified at the suppression hearing that he met with the SOI in May 2022, and the temporary registration tag on Arnold's truck further confirms this date.

[2]McKinney's affidavit provides only Officer Fislar's last name, and his involvement in the investigation was not mentioned at trial.

3

who then began surveillance at the End Zone. While sitting in the End Zone parking lot at 2:18 a.m. on May 8, 2022, Fislar saw a man matching Arnold's description going to and from a white Ford F-150 pickup truck that had the same temporary registration tag as that reflected in Arnold's Facebook video. Within a thirty-minute period, Arnold went to and from the truck "multiple times" accompanied by different people each time. Fislar suspected that these were "hand[-]to[-]hand narcotics deals."

When Arnold left the End Zone, Fislar followed him. The license-plate lamp on Arnold's truck was dim, and the temporary registration tag was not properly attached. And so because Fislar could not read the temporary registration tag attached to the truck, Fislar stopped Arnold's vehicle. *See* Tex. Transp. Code Ann. § 547.322(f) (requiring motor vehicles to have a lamp bright enough to make a vehicle's rear license plate readable from fifty feet).

During the stop, Fislar asked Arnold if he had anything illegal in the truck. Arnold became agitated, did not answer the question, and attempted to change the subject. Fislar asked again, and Arnold again became agitated, "put his hand on top of his head," and said that he did not have anything illegal in the truck. When Fislar told Arnold to get out of the truck, Arnold rolled up the windows and "insisted on closing his own door and locking the truck." Arnold declined consent to search the truck. Arnold also insisted on retrieving his cell phone from his truck. Based on Arnold's behavior during the stop and his suspected narcotics deals in the End Zone parking lot, Fislar called for a canine unit to conduct an open-air sniff of Arnold's truck.

4

A canine unit responded, conducted an open-air sniff, and alerted to the presence of illegal narcotics. Fislar searched the truck and found "approximately 6.755 ounces" of marijuana; ".7 grams" of cocaine; many "small, unused plastic baggies commonly used to package narcotics for sale"; multiple digital scales with "white powder like residue on them"; and "several loose U[.]S[.] [c]urrency bills." Fislar arrested Arnold and discovered "a large amount of U[.]S[.] [c]urrency, mostly in twenty[-]dollar bills" in Arnold's wallet.

Based on these discoveries, McKinney sought a warrant to place a mobile tracking device on Arnold's truck. According to his probable-cause affidavit, McKinney believed that Arnold's truck was the sole vehicle involved in the criminal enterprise and that tracking it would provide "invaluable information," such as "possible stash[-]house locations," Arnold's "schedule and routes for illegal activity," and "possibl[e] . . . accomplices." A district court issued the warrant, and the LEPD placed a global positioning system (GPS) tracker on Arnold's truck.

After Arnold was released, LEPD officers followed his movements over the next several weeks via the GPS tracker. During that time, Arnold visited the End Zone multiple times. He also visited other Denton County bars around the same time every night. After each visit, Arnold would go to two residences, one of which was the Celina residence. McKinney testified that this pattern was consistent with someone dealing drugs. Thus, the LEPD set up a "buy/bust operation" in which an LEPD officer

5

arranged to buy drugs from Arnold at an agreed location intending to arrest him when he appeared to make the sale.

LEPD officers followed Arnold's movements via the GPS tracker on the day of the scheduled sale. At the last minute, Arnold changed the sale location, but the GPS tracker indicated that his truck had stopped a couple of blocks away. Officers investigated and found the truck unoccupied. They later found Arnold on foot at the new sale location, detained him, and transported him back to his truck. A canine unit then performed an open-air sniff of Arnold's truck and alerted to narcotics inside the truck. The officers searched the truck, found illegal prescription drugs, and arrested Arnold. After Arnold's arrest, officers searched the truck again, and after they disassembled the glovebox, they found marijuana and cocaine.

Arnold was charged with possession of a controlled substance with intent to deliver. *See* Tex. Health & Safety Code Ann. § 481.112. Before trial, Arnold moved to suppress evidence obtained through the GPS tracker, arguing that the LEPD's "reliance on an unreliable CI" rendered the warrant invalid.[3] The trial court heard and orally denied Arnold's motion, summarily finding that McKinney's probable-cause affidavit met the requirements of Texas Code of Criminal Procedure Article 18B.202. Tex. Code Crim. Proc. Ann. art. 18B.202 ("Order Authorizing Installation and Use of Mobile

---

[3]Arnold filed two other motions to suppress, but these motions are not an issue in this appeal.

Tracking Device"). A jury convicted Arnold and assessed punishment at twenty-five years in prison. The trial court issued a judgment consistent with the jury's verdict, and this appeal followed.

## II. Discussion

In one issue, Arnold contends that the trial court erred by denying his motion to suppress the evidence obtained from the GPS tracker because there was no probable cause for the warrant permitting the tracker's use.

### A. Standard of Review

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *State v. Martinez*, 570 S.W.3d 278, 281 (Tex. Crim. App. 2019). Because the trial judge is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony, *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007), we defer almost totally to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on evaluating credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor, *Martinez*, 570 S.W.3d at 281.

When, as here, the record is silent on the reasons for the trial court's ruling, or when there are no explicit fact findings and neither party timely requested findings and conclusions from the trial court, we infer the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim.

7

App. 2013); *State v. Kelly*, 204 S.W.3d 808, 818–19 (Tex. Crim. App. 2006). We then review the trial court's legal ruling de novo unless the implied fact findings supported by the record are also dispositive of the legal ruling. *Kelly*, 204 S.W.3d at 819.

## B. Applicable Law

"[T]he Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'" *United States v. Jones*, 565 U.S. 400, 404, 132 S. Ct. 945, 949 (2012); *State v. Jackson*, 464 S.W.3d 724, 730 (Tex. Crim. App. 2015). To obtain a warrant to install and use a mobile tracking device a law enforcement officer must produce an affidavit stating, among other things, "facts and circumstances" showing probable cause that "criminal activity has been, is, or will be committed; and . . . the installation and use of a mobile tracking device is likely to produce information that is material to an ongoing criminal investigation of that criminal activity." Tex. Code Crim. Proc. Ann. art. 18B.202(c)(5).

## C. Analysis

Arnold takes issue with the two sources of evidence cited in McKinney's probable-cause affidavit. First, Arnold asserts that the May 2022 traffic stop and vehicle search were "based largely on information from anonymous informants of unknown reliability." He next asserts that there was "no basis to search the vehicle otherwise[] or to prolong the traffic stop beyond the time needed to accomplish its pretextual purpose." According to Arnold, the LEPD's reliance on an "inherently unreliable informant[] from within the 'criminal milieu'" and evidence obtained during the

8

"pretextual" traffic stop were insufficient to provide probable cause for the warrant. Thus, he maintains that the trial court erred by denying his motion to suppress.

### 1. Confidential Informants

"A snitch, or a CI, may supply probable cause if he has a proven track record of providing reliable information." *Diaz v. State*, 632 S.W.3d 889, 893 (Tex. Crim. App. 2021). Even without a track record, a CI's information "may be reliable for other reasons, e.g., because it is corroborated, it is a statement against penal interest, it is consistent with other information, it is a detailed, first-hand account, or it is paired with an accurate prediction of the subject's future behavior." *Id.*

The record reflects that the CI's and SOI's information met these reliability indicia. Specifically, both the CI and the SOI alleged that "Alvin" drove a white Ford F-150 pickup truck and sold cocaine at the End Zone every night. As noted in McKinney's affidavit, the CI's statement was against penal interest and both informants' statements were based on first-hand knowledge. McKinney also verified the information by confirming Arnold's identity, using the phone number supplied by the SOI. Fislar also confirmed the informants' allegations by watching Arnold conduct suspected hand-to-hand narcotics deals outside of the End Zone. Thus, not only did their information prove true, but the informants also accurately predicted Arnold's future behavior. On this record, we conclude that the CI's and SOI's information was sufficiently reliable to support McKinney's probable-cause affidavit. *See id.*

## 2. The May 2022 Traffic Stop

Interactions between police and citizens are generally categorized as: "(1) consensual encounters that do not implicate the Fourth Amendment; (2) investigative detentions that must be supported by a reasonable suspicion of criminal activity; and (3) arrests that are reasonable only if supported by probable cause." *Monjaras v. State*, 664 S.W.3d 921, 927 (Tex. Crim. App. 2022). It is undisputed that Arnold was subjected to an investigative detention when Fislar stopped him in May 2022. *See id.* ("An encounter is a detention if an officer, through a showing of force or authority, restrains a citizen to the point that an objectively reasonable person would not feel free to decline the officer's requests or terminate the encounter."). To detain Arnold, Fislar must have had a reasonable suspicion that criminal activity may have been afoot. *See Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 1884–85 (1968); *see also Crain v. State*, 315 S.W.3d 43, 52 (Tex. Crim. App. 2010); *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). Reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity. *Ford*, 158 S.W.3d at 492. This is an objective standard that disregards the detaining officer's subjective intent and looks solely to whether the officer has an objective basis for the stop. *Id.*

An officer may not act solely on a hunch, but his determination of "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls

10

considerably short of satisfying a preponderance of the evidence standard." *Tanner v. State*, 228 S.W.3d 852, 856 (Tex. App.—Austin 2007, no pet.) (citing *United States v. Arvizu*, 534 U.S. 266, 274, 122 S. Ct. 744, 751 (2002)). The facts adduced to give rise to a reasonable suspicion need not show that a person has committed, is committing, or is about to commit a particular and distinctively identifiable penal offense. *Derichsweiler v. State*, 348 S.W.3d 906, 916–17 (Tex. Crim. App. 2011). Instead, the articulable facts need only show (1) the occurrence of "some activity out of the ordinary . . . , [(2)] some suggestion to connect the detainee to the unusual activity, and [(3)] some indication that the unusual activity is related to crime." *Johnson v. State*, 622 S.W.3d 378, 384 (Tex. Crim. App. 2021). Thus, when determining whether reasonable suspicion existed, a court does not inquire whether conduct is innocent or guilty but considers instead "the degree of suspicion that attaches to particular types of noncriminal acts." *United States v. Sokolow*, 490 U.S. 1, 10, 109 S. Ct. 1581, 1587 (1989).

Fislar stopped Arnold in May 2022 after watching him make suspected narcotics deals at the End Zone and because his truck's temporary registration tag was not readable. According to McKinney's affidavit, Fislar could not read the temporary registration tag from fifty feet because it was "flapping in the wind" and the truck's license-plate lamp was "very dim." Arnold did not contest these allegations. It is a violation to operate a motor vehicle without a lamp that "makes the [rear license] plate clearly legible at a distance of 50 feet," Tex. Transp. Code Ann. § 547.322(f)(2), and law enforcement personnel have probable cause to stop someone who commits a traffic

11

violation, *State v. Gray*, 158 S.W.3d 465, 469–70 (Tex. Crim. App. 2005). Thus, Fislar had probable cause to stop Arnold for a traffic violation. *See Palacios v. State*, 319 S.W.3d 68, 73 (Tex. App.—San Antonio 2010, pet. ref'd) (holding that the police officer had probable cause to stop appellant because his vehicle's license plate was not illuminated when the vehicle's headlights were on).

Although Arnold does not contest the alleged traffic violation, he does assert that Fislar had no basis to search his truck and that he should have been released as soon as the stop's "pretextual purpose" was compete.[4] Citing *Carillo v. State*, No. 05-12-00544-CR, 2014 WL 465424, at *6 (Tex. App.—Dallas Feb. 4, 2014, no pet.) (mem. op., not designated for publication), Arnold contends that Fislar did not have reasonable suspicion to search his truck and did so based solely on an "inchoate hunch" when Arnold refused to permit the search. We disagree with Arnold's conclusion and find *Carillo* inapposite.

In *Carillo*, officers detained the defendant for a traffic stop after observing him arrive at a mobile home that a "tip" had indicated was involved in narcotics transactions. *Id.* at *1. The defendant had stayed inside the mobile home for about fifteen minutes before leaving in his pickup truck. *Id.* After being followed for thirty minutes by

---

[4]Although not expressly argued in his brief, Arnold's characterization of the traffic stop as "pretextual" implies that he believes that it was improper. But a law-enforcement officer's subjective motive for seizing a suspect does not render an objectively reasonable seizure unlawful under the federal or state constitutions. *Gray*, 158 S.W.3d at 469–70.

multiple unmarked police cars, the defendant began driving to "different locations[,] . . . making u-turns, [and] going into businesses" in an apparent attempt to lose the cars following him. *Id.* Officers stopped the defendant fifteen minutes later for a traffic violation. *Id.* During the stop, the defendant was calm and cooperative, answered the officers' questions, and provided his license. *Id.* After a warrant check came back clear, the officers asked for consent to search the truck, and the defendant refused. *Id.* He was then detained at the scene for nearly an hour while the officers waited for a canine unit to arrive. *Id.* The dog alerted to illegal drugs inside of the defendant's truck, and the officers found cocaine in the truck. *Id.* The trial court denied the defendant's motion to suppress, finding that "the critical thing, right or wrong, is that the defendant did not give consent to search [and] that allowed the officers then to seek a dog sniff." *Id.* at *2.

The Dallas Court of Appeals concluded that the extended detention was based on the investigating officer's testimony that the defendant "stopped at a mobile home [that] was allegedly involved in narcotics, [although he] was not seen carrying anything in or out of the home," and that "after being followed for thirty minutes by numerous unmarked surveillance cars, [the defendant] pulled into a shopping center and drove around, pulling in and out of locations." *Id.* at *5. The court concluded that these observations were "no more than inchoate and unparticularized hunches" that cannot provide reasonable suspicion for a prolonged detention. *Id.* Rejecting the trial court's conclusion that the defendant's "refusal to consent to a search gave the officers the

13

reasonable suspicion needed to further detain [the defendant]," the court concluded that the officers did not have reasonable suspicion to detain the defendant once the traffic stop had ended. *Id.* at *5-6.

As previously noted, Fislar relied on more than Arnold's refusal to consent when he extended Arnold's detention. When he stopped Arnold, Fislar knew that Arnold was suspected of selling cocaine at the End Zone based on the informants' verified information, and he had seen Arnold conduct suspected hand-to-hand narcotics deals. Thus, he had more than an inchoate hunch, and *Carillo* is unhelpful.

In contrast, we find our holding in *Torrence v. State* more useful. No. 02-10-00027-CR, 2011 WL 2518807, at *6 (Tex. App.—Fort Worth June 23, 2011, no pet.) (mem. op., not designated for publication). In *Torrence*, a narcotics investigator was out investigating leads when he saw a car that a CI had previously identified as the car from which Torrence dealt "'ice' or methamphetamine." *Id.* at *1. The investigator watched as the car "and another vehicle pulled close together in a Waffle House parking lot and stopped 'driver's door to driver's door.'" *Id.* According to the investigator, the drivers appeared to have "shaken hands or made a drug transaction." *Id.* n.2. He suspected criminal activity and sought a patrol unit to make a traffic stop. *Id.* at *1. A patrol unit stopped Torrence, and as the officer approached, Torrence "reach[ed] and ma[de] furtive movements in the vehicle towards the center console and underneath the seat as if she were reaching for or concealing something." *Id.* Torrence was also "extremely nervous and trembling" when she got out of the car. *Id.* She denied consent to search

14

or having anything illegal in her car. *Id.* at *2. The patrol officer requested a canine unit that conducted an open-air sniff and alerted to illegal drugs in the car. *Id.* Police searched the car and found marijuana and methamphetamine. *Id.*

On appeal from her conviction, Torrence asserted that the CI's information and the officers' on-scene observations failed to provide reasonable suspicion to extend her detention for a canine sniff. *Id.* at *4. We concluded, however, that the objective facts known by the officers at the scene, including the verified CI information, "the apparent drug transaction at the Waffle House, and [Torrence's] behavior during the initial traffic stop," gave the officers "a substantial basis for concluding that [Torrence] was, had been, or soon would be involved in illegal narcotics activity." *Id.* at *8; *see also Ford*, 158 S.W.3d at 492.

Both the investigator in *Torrence* and Fislar here began surveilling the defendant based on a CI's verified allegation about illegal drug sales. *See Torrence*, 2011 WL 2518807, at *1. *Carillo* involved no such allegation. *See Carillo*, 2014 WL 465424 at *1. Nor had the officers in *Carillo* seen the defendant involved in any apparent drug transaction. *Id.* In contrast, both Fislar and the investigator in *Torrence* had witnessed the respective defendant conduct apparent drug transactions before the traffic stops. *See Torrence*, 2011 WL 2518807, at *1. Finally, in contrast to Carillo's calm and cooperative demeanor during the traffic stop, both Torrence and Arnold became nervous and appeared to be concealing something during their traffic stops. *See Carillo*, 2014 WL 465424, at *1; *Torrence*, 2011 WL 2518807, at *1. As in *Torrence*, these facts

provided Fislar with a substantial basis to conclude that Arnold was, had been, or soon would be involved in illegal narcotics activity, and there was reasonable suspicion to detain Arnold for the canine sniff of Arnold's truck. *See Ford*, 158 S.W.3d at 492.

In sum, Arnold's contention that the warrant lacked probable cause is based solely on his assertion that the LEPD "had insufficient justification to prolong the [May 8, 2022] traffic stop and search [his] vehicle." Although the LEPD relied on information from the CI and SOI to surveil Arnold, that information was verified before Arnold was stopped and arrested on May 8, 2022. And that information merely prompted the LEPD's investigation; it was not the basis for the investigative detention. The detention was based instead on McKinney's research and Fislar's observations of Arnold that night. Accordingly, we conclude that Fislar had sufficient justification to prolong Arnold's May 8, 2022 detention, and we overrule Arnold's sole issue.

### III.  Conclusion

Having overruled Arnold's sole issue, we affirm the trial court's judgment.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  May 23, 2024

16