

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00211-CR

———————————————

KENDRA ANDERSON AKA HONESTY LOVE TRUTH, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 43rd District Court
Parker County, Texas
Trial Court No. CR22-0248

Before Sudderth, C.J.; Womack and Walker, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

## I. INTRODUCTION

A jury convicted Appellant Kendra Anderson aka Honesty Love Truth of retaliation.[1] *See* Tex. Penal Code Ann. § 36.06. The trial court assessed Anderson's punishment at eight years' confinement. In two issues on appeal, Anderson argues that (1) the trial court failed to ensure that she made a knowing and intelligent waiver of her right to counsel and (2) the trial court erred by admitting into evidence certain statements that she had made to police in violation of *Miranda*[2] and Article 38.22 of the Texas Code of Criminal Procedure. We will affirm.

## II. BACKGROUND

### A. Anderson's Arrest

On December 30, 2021, three law enforcement officers with the Willow Park Police Department—Daniel Franklin, Ryan Malwitz, and Quincy Hamilton[3]—were dispatched to the Quality Inn in Willow Park. Officers were told that two occupants

---

[1]While Appellant identifies herself as "Kendra Anderson a/k/a Honesty Love Truth" in her appellant's brief, the subject indictment, judgment, and notice of appeal identify her as "Kendra Anderson aka Honesty Love Truth," and we have styled the case accordingly. We will simply refer to Appellant as "Anderson."

[2]*See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

[3]At the time of Anderson's arrest, Franklin was a captain, Malwitz was a corporal, and Hamilton was an officer. At the time of Anderson's trial, Franklin was the chief of the Willow Park Police Department, Malwitz was an officer, and Hamilton was a lieutenant. Malwitz testified that his demotion from corporal to officer was unrelated to Anderson's case.

of the motel were allegedly smoking marijuana and that employees wanted them to leave the premises. When officers arrived, employees from the motel told them that "[t]here was a black female and a white male inside one of the rooms that were smoking marijuana." While officers were speaking with one of the employees outside, they observed a black woman—later identified as Anderson—run across the parking lot toward a shed located in the parking lot. The employee told officers, "That's her." Officers then observed Anderson drop something behind the shed and run back to her room.

Malwitz and Hamilton followed Anderson to her room, while Franklin went to the shed. While searching behind the shed, Franklin found an apple pie box with marijuana inside. When Malwitz and Hamilton went to Anderson's room,[4] she started yelling at them and accusing them of racism. Hamilton escorted Anderson from the room while she continued yelling at him. Once outside the room, Franklin instructed Hamilton to detain Anderson due to the marijuana found behind the shed. When officers attempted to detain her, Anderson became "combative"[5] with officers, but they eventually handcuffed her and placed her inside of Malwitz's patrol vehicle.

---

[4]Anderson was alone in the room when Malwitz and Hamilton arrived.

[5]At trial, Hamilton testified that Anderson "became combative" when officers attempted to detain her, noting that she had "used her body weight to pull against" the officers and that she had "kicked off the wall" of the motel in an attempt to resist detention.

After she was inside of his vehicle, Malwitz told Anderson that she was "under arrest at this point."

Despite being handcuffed and placed under arrest, Anderson was not given any *Miranda* warnings. Hamilton testified that Anderson was not given the warnings while she was being detained because she was combative and the officers were not concerned with asking Anderson any questions at that time. Malwitz testified that he did not give Anderson any *Miranda* warnings after placing her in his patrol vehicle because he was "not conducting a[n] interrogation" and that at no time did he "conduct an interrogation."

## B.  Anderson's Statements to Police

After being placed in the patrol vehicle and told that she was under arrest, Anderson denied that she had possessed any drugs. Malwitz then asked her, "What about the stuff you threw behind the shed?" In response to Malwitz's question, Anderson continued denying any wrongdoing, and Malwitz asked, "Why didn't we just talk about it? Why did you start screaming at me and everything?" Anderson continued denying wrongdoing, and Malwitz left his vehicle to go back to Anderson's room and confer with the other officers.

Malwitz returned to the vehicle ten minutes later and began driving Anderson away from the motel toward the jail. Anderson began berating Malwitz immediately after he returned to the vehicle. Approximately one minute after he returned to the vehicle, Anderson asked for Malwitz's name, he gave it to her, and she stated, "How

4

long you think you gonna live, Malwitz?  Not that long, I bet you."  Malwitz then asked if Anderson wanted to "add terroristic threat."  Anderson replied that she "didn't say that," that "it's a promise," that Malwitz was "going to regret this little, small shit," and that his "family will, too."  Later during the ride, after Anderson again said that she had done nothing wrong, Malwitz asked, "So why did you resist us? Why didn't you just talk to us?"  Anderson then began recounting her version of what transpired at the motel.

After arriving at the jail, Anderson told Malwitz—in an apparent reference to Hamilton[6]—"that weak-ass n***** hate hisself and he gonna die too.  That's a promise.  Cause this shit ain't about to happen without a motherf***er dying about me.  He's gonna die."  She continued, "He can die for jeopardizing my freedom.  He gonna lose his life for not having his own people's back. . . .  He's gonna die.  That's what's gonna happen."  She asked Malwitz, "What are y'all gonna do about it when your officer is dead from a bullet to his head?"  While other jail personnel were attending to her, Anderson stated, "What's your name . . . Malwitz?  Gonna die. Cause that ain't no threat, you feel me?  Everybody gonna die, you feel me?" Anderson continued yelling as Malwitz walked away from her, concluding by saying that she would "hold everybody accountable or people will die" and that "over [her] freedom, people can lose their lives."

---

[6]Hamilton is black.

## C. Procedural Background

Anderson was indicted for retaliation due to her threats made to Malwitz.[7] Initially, Anderson had appointed counsel, but she later retained counsel. Her retained counsel filed a motion to withdraw, and following a hearing, the trial court granted the motion. At the conclusion of that hearing, Anderson told the trial court that she did not want to get another court-appointed attorney but that she intended to hire new counsel.

After almost two months passed and Anderson had not hired new counsel, the trial court inquired as to whether Anderson still intended to hire counsel or if she desired to proceed pro se. Anderson initially told the trial court that she was "considering hybrid representation" but later told the court that she "would like to go pro se with standby counsel." The trial court then admonished Anderson about the dangers of self-representation and tendered to her a written document titled "Judicial Admonishments and Written Waiver of Right to Counsel."[8] The trial court found that Anderson was competent to represent herself at trial and that she was knowingly

---

[7]The indictment alleged that Anderson, on or about December 30, 2021, "did then and their intentionally and knowingly threaten to harm another, namely Ryan Malwitz, by an unlawful act, namely stating the said Ryan Malwitz was going to die, in retaliation for or on account of the status of Ryan Malwitz as a public servant, namely a police officer."

[8]Although the written document had a space for Anderson to sign it to acknowledge that she was voluntarily and intelligently waiving her right to counsel, Anderson did not sign the written document.

and voluntarily waiving her right to counsel. Later in the hearing, Anderson told the trial court that she would be "moving forward with filing the necessary motions pro se without waiving the right to counsel."

That same day, the trial court sua sponte appointed standby counsel. Standby counsel was available for Anderson throughout the remainder of her case.[9] Anderson consulted with her standby counsel on numerous occasions. Following the appointment of standby counsel, the trial court inquired on several occasions whether Anderson desired to proceed pro se or whether she desired for standby counsel to represent her. Anderson confirmed on each occasion that she wished to represent herself pro se.

In advance of trial, Anderson filed a motion to suppress her statements made to Malwitz, arguing that the statements were made in violation of Article 38.22 of the Texas Code of Criminal Procedure and that she had not been given "her Miranda Admonishment." Following a hearing in which Hamilton and Malwitz testified,[10] the trial court denied Anderson's motion to suppress. The case proceeded to trial, where

---

[9]Standby counsel was present throughout trial and at all hearings after he was appointed save one—a short hearing where the trial court simply informed the parties that they would not be going to trial that day due to a "specially set number one case" that was going to trial.

[10]A video taken from Hamilton's bodycam was admitted at the suppression hearing, as was a video taken from the dashcam of Malwitz's patrol vehicle.

Hamilton and Malwitz again testified.[11] The jury returned a guilty verdict, and the trial court assessed Anderson's punishment at eight years' confinement. This appeal followed.

## III. DISCUSSION

### A. Anderson's Complaint Regarding the Waiver of Her Right to Counsel

In her first issue, Anderson complains that the trial court failed to ensure that she made a knowing and intelligent waiver of her right to counsel.

#### 1. Standard of Review

While we review a trial court's decision to allow for self-representation for an abuse of discretion, *see McCain v. State*, No. 02-17-00210-CR, 2018 WL 3059964, at *5 (Tex. App.—Fort Worth June 21, 2018, no pet.) (mem. op., not designated for publication), we review de novo the issue of whether the trial court ensured that the defendant made a knowing and intelligent waiver of her right to counsel. *See Meek v. State*, No. 06-23-00035-CR, 2023 WL 5520839, at *4 (Tex. App.—Texarkana Aug. 28, 2023, no pet.) (mem. op., not designated for publication) (reviewing de novo appellant's complaint that he did not intelligently, knowingly, and voluntarily waive his right to counsel); *Hernandez v. State*, No. 03-19-00202-CR, 2020 WL 3526355, at *5 (Tex. App.—Austin June 30, 2020, no pet.) (mem. op., not designated for publication)

---

[11]The video from Hamilton's bodycam was admitted at trial, as was the video taken from the dashcam of Malwitz's patrol vehicle. A video taken from Malwitz's bodycam—which had not been offered at the suppression hearing—was also admitted at trial.

8

(reviewing de novo appellant's complaints that he did not knowingly and voluntarily waive his right to counsel and that the trial court did not give him adequate admonishments about the dangers and disadvantages of self-representation); *see also Webb v. State*, No. 03-22-00203-CR, 2023 WL 4828389, at *4 (Tex. App.—Austin July 28, 2023, no pet.) (mem. op., not designated for publication) ("Appellate courts review de novo issues challenging the propriety of a waiver of the right to counsel on the basis that the trial court did not properly warn a defendant about the dangers and disadvantages of self-representation.").

### 2. Applicable Law

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI; *see Williams v. State*, 252 S.W.3d 353, 355 (Tex. Crim. App. 2008). The Sixth Amendment also "implies a right of self-representation." *Faretta v. California*, 422 U.S. 806, 821, 95 S. Ct. 2525, 2534 (1975); *see Williams*, 252 S.W.3d at 356. The right of self-representation must be timely, clearly, and unequivocally asserted. *Faretta*, 422 U.S. at 835, 95 S. Ct. at 2541. "When the plain, ordinary, and generally accepted meaning of an accused's statements signify a desire to proceed pro se, the right is clearly and unequivocally asserted." *Cochnauer v. State*, No. 02-19-00165-CR, 2021 WL 3931914, at *5 (Tex. App.—Fort Worth Sept. 2, 2021, no pet.) (mem. op., not designated for publication) (citing *Lathem v. State*, 514 S.W.3d 796, 808 (Tex. App.—Fort Worth 2017, no pet.)).

To be effective, a defendant's waiver of her right to self-representation must be made voluntarily, knowingly, and intelligently. *Id.* at \*5. To assess an effective waiver, a court must consider the totality of the circumstances. *Id.* (citing *Williams*, 252 S.W.3d at 356). A trial court does not need to follow any formulaic questioning or particular script in ascertaining the effectiveness of the waiver. *Cofer v. State*, No. 02-16-00101-CR, 2017 WL 3821885, at \*2 (Tex. App.—Fort Worth Aug. 31, 2017, no pet.) (mem. op., not designated for publication). "However, if such factors are not otherwise apparent from the record, a trial court's inquiry regarding the defendant's waiver of counsel should center on [her] background, age, experience, and education." *Id.*; *cf. Cochnauer*, 2021 WL 3931914, at \*5 ("*Faretta* does not mandate questioning on the accused's age, education, background, or previous mental history, but the record must contain proper admonishments about pro se representation.").

### 3. Analysis

Anderson argues that the trial court failed to ensure that she made a knowing and intelligent waiver of her right to counsel, contending that "the trial court failed to inquire into her background, experience with the legal system, education, or any other factors necessary to ensure that she understood the significance and consequences of such a waiver." The State counters that because Anderson was appointed standby counsel, it was unnecessary for the trial court to provide her with any admonishments, and thus, any defect in the trial court's admonishments was not error. We agree with the State.

10

We have held, on multiple occasions, that *Faretta* admonishments are not required when a defendant has been appointed standby counsel. *See Cochnauer*, 2021 WL 3931914, at *5 ("*Faretta* admonishments are not required when standby counsel is appointed and utilized."); *Glasspoole v. State*, No. 02-16-00066-CR, 2016 WL 4045087, at *2 (Tex. App.—Fort Worth July 28, 2016, no pet.) (mem. op., not designated for publication) (holding that "'no question of waiver of counsel is involved' in cases of hybrid representation or cases when a defendant has access to standby counsel"); *Anderson v. State*, No. 2-02-060-CR, 2003 WL 21101519, at *2 (Tex. App.—Fort Worth May 15, 2003, pet. ref'd) (per curiam) (not designated for publication) ("[B]ecause the record reflects appellant had been appointed standby counsel before the time the earliest motions were heard, there was no *Faretta* error.").

Other Texas courts have held similarly. *See, e.g.*, *Anthony v. State*, No. 01-21-00552-CR, 2023 WL 5616203, at *11 (Tex. App.—Houston [1st Dist.] Aug. 31, 2023, pet. ref'd) (mem. op., not designated for publication) ("[W]hen a trial court appoints standby counsel, it is not required to admonish the defendant of the dangers of self-representation."); *King v. State*, No. 05-18-01116-CR, 2020 WL 1452046, at *2 (Tex. App.—Dallas Mar. 25, 2020, pet. ref'd) (mem. op., not designated for publication) (holding that *Faretta* admonishments are not required when a trial court appoints standby counsel and that no question of waiver is involved when standby counsel is appointed); *Jones v. State*, No. 14-04-00950-CR, 2005 WL 2787306, at *1 (Tex. App.—Houston [14th Dist.] Oct. 27, 2005, no pet.) (per curiam) (mem. op., not designated

11

for publication) ("A judge need not admonish an accused of the dangers and disadvantages of self-representation when he allows the accused to present his own defense but, at the same time, appoints standby counsel to advise the accused as necessary."); *but see Grant v. State*, 255 S.W.3d 642, 647 (Tex. App.—Beaumont 2007, no pet.) ("[W]e do not regard appointment of standby counsel as relieving the trial court of the responsibility to admonish a defendant of the dangers of self-representation.").

Anderson candidly acknowledges the authority contrary to her position. She asks us, however, to disregard this authority. She says that we should instead look to the Fifth Circuit's decision in *United States v. Davis* and the Beaumont Court of Appeals' decision in *Grant*, both of which suggest that the appointment of standby counsel does not satisfy the Sixth Amendment right to counsel. *See United States v. Davis*, 269 F.3d 514, 520 (5th Cir. 2001) ("Standby assistance of counsel, however, does not satisfy the Sixth Amendment right to counsel."); *Grant*, 255 S.W.3d at 647 (stating that *Faretta* admonishments "should be given regardless of the appointment of standby counsel"). We are not bound by those authorities, and we see no reason to revisit our prior holdings that have squarely spoken on this issue. *See Ex parte Thomas*, 623 S.W.3d 370, 381 (Tex. Crim. App. 2021) (noting that "there is a strong presumption in favor of established law"); *Tiller v. State*, No. 05-21-00653-CR, 2022 WL 2093008, at *2 (Tex. App.—Dallas June 10, 2022, no pet.) (mem. op., not designated for publication) (holding that intermediate courts of appeals are "bound to

12

follow [their] own precedent unless it conflicts with an opinion of the Court of Criminal Appeals"); *Johnson v. Nat'l Oilwell Varco, LP*, 574 S.W.3d 1, 10 (Tex. App.—Houston [14th Dist.] 2018, no pet.) ("As an intermediate Texas court of appeals, we are not bound to follow precedent from the Fifth Circuit even on matters of federal law.").

Here, Anderson told the trial court that she "would like to go pro se with standby counsel." The trial court admonished Anderson about the dangers of self-representation and gave her a written document containing admonishments titled "Judicial Admonishments and Written Waiver of Right to Counsel."[12] The trial court appointed standby counsel, and Anderson represented herself at trial after confirming on multiple occasions that she wished to proceed pro se.[13] As acknowledged by Anderson in her brief, "[s]tandby counsel was present . . . throughout the entirety of her case" following the appointment, and the record makes clear that Anderson consulted with her standby counsel on numerous occasions. Because Anderson had standby counsel at her disposal, the trial court was not required to make *Faretta* admonishments, and there is no question of waiver regarding her right to counsel. *See*

---

[12]In her brief, Anderson acknowledges that the trial court "provide[d] a series of thorough admonishments to [her] regarding the dangers of self-representation."

[13]While Anderson did not sign the written waiver of her right to counsel and at one point stated that she desired to proceed "pro se without waiving the right to counsel," she later confirmed to the trial court on several occasions that she wished to represent herself with standby counsel.

*Cochnauer*, 2021 WL 3931914, at \*5; *Glasspoole*, 2016 WL 4045087, at \*2; *Anderson*, 2003 WL 21101519, at \*2; *see also King*, 2020 WL 1452046, at \*3 ("We cannot conclude the trial court did not adequately . . . assess whether appellant voluntarily, knowingly, and intelligently waived his right to counsel because appellant had standby counsel at his disposal and, as a result, the trial court was not required to admonish appellant."). We overrule Anderson's first issue.

## B. Anderson's Complaint Regarding the Admission of Her Statements to Police

In her second issue, Anderson complains that the trial court should have suppressed the statements that she made to police while she was under arrest, contending that the trial court improperly admitted those statements in violation of *Miranda* and Article 38.22.

### 1. Standard of Review

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *State v. Martinez*, 570 S.W.3d 278, 281 (Tex. Crim. App. 2019). Because the trial judge is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony, *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007), we defer almost totally to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on evaluating credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor, *Martinez*, 570 S.W.3d at 281. We use

that same standard in reviewing claims concerning *Miranda* violations and the admission of statements made as the result of a custodial interrogation. *Pecina v. State*, 361 S.W.3d 68, 78–79 (Tex. Crim. App. 2012).

### 2. Applicable Law

The Fifth Amendment protects a criminal defendant from being forced to bear witness against herself. U.S. Const. amend V. In *Miranda*, the United States Supreme Court crafted safeguards to protect the Fifth Amendment privilege against self-incrimination in the atmosphere of custodial interrogations. *Pecina*, 361 S.W.3d at 75; *see Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612. Specifically, *Miranda* requires that, before any questioning occurs, a suspect in custody must be advised that: (1) she has the right to remain silent; (2) anything she says can be used against her in a court of law; (3) she has the right to the presence of an attorney; and (4) if she cannot afford an attorney, one will be appointed for her prior to any questioning if she so desires. *Florida v. Powell*, 559 U.S. 50, 59–60, 130 S. Ct. 1195, 1203 (2010) (citing *Miranda*, 384 U.S. at 479, 86 S. Ct. at 1630). The warnings set forth in Article 38.22 are "virtually identical" to *Miranda*, except that they also require the warning that an accused may terminate an interview at any time. *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007); *see* Tex. Code Crim. Proc. Ann. art. 38.22, § 2. *Miranda* and Article 38.22 are applicable only when a defendant has been subjected to a custodial interrogation. *State v. Radke*, No. 10-19-00263-CR, 2022 WL 1105602, at *4 (Tex. App.—Waco Apr. 13, 2022, pet. ref'd) (mem. op., not designated for publication).

15

The defendant bears the burden of proving that a statement was the product of a custodial interrogation. *Herrera*, 241 S.W.3d at 526. "Interrogation means express questioning that the police should know is likely to elicit an incriminating response or any words or actions by the police that the police should know will do so." *Farris v. State*, No. 02-17-00013-CR, 2018 WL 1865932, at *4 (Tex. App.—Fort Worth Apr. 19, 2018, no pet.) (mem. op., not designated for publication). To qualify as an interrogation, "there must be a measure of compulsion." *Edwards v. State*, No. 02-22-00022-CR, 2023 WL 5115745, at *10 (Tex. App.—Fort Worth Aug. 10, 2023, pet. ref'd) (mem. op., not designated for publication). "Thus, even when the accused is in custody, volunteered statements are not barred by *Miranda*." *Id.* (citing *Pugh v. State*, 624 S.W.3d 565, 568 (Tex. Crim. App. 2021)).

"Furthermore, an officer's response to a question from someone in custody does not amount to an interrogation." *Id.* (citing *United States v. Crisolis-Gonzalez*, 742 F.3d 830, 837 (8th Cir. 2014)). Indeed, "[w]hen a defendant initiates a conversation about the facts of an offense, generally no interrogation occurs." *Id.* (citing *Vasquez v. State*, No. 14-01-01018-CR, 2003 WL 60518, at *2 (Tex. App.—Houston [14th Dist.] Jan. 9, 2003, pet. ref'd) (mem. op., not designated for publication)). Further, "[w]hen an accused in custody spontaneously volunteers information that is not in response to earlier interrogation by authorities, the statement is admissible . . . because it is not the product of custodial interrogation."

16

*Carter v. State*, No. 01-17-00159-CR, 2018 WL 5259895, at *2 (Tex. App.—Houston [1st Dist.] Oct. 23, 2018, no pet.) (mem. op., not designated for publication).

### 3. Analysis

Here, it is undisputed that Anderson was in custody when she made the statements to Malwitz that form the basis of the underlying retaliation offense. Thus, our analysis hinges on whether Anderson's statements were made as a result of an interrogation.

While Malwitz did ask Anderson questions pertaining to the marijuana found behind the shed without first giving her the warnings required by *Miranda* and Article 38.22—"What about the stuff you threw behind the shed?" and "Why didn't we just talk about it? Why did you start screaming at me and everything?"—those questions were asked well before Anderson made the threatening statements toward Malwitz.[14] Indeed, after asking those questions and after Anderson continued denying

---

[14]In her brief, Anderson argues that we should consider not only the evidence admitted at the suppression hearing but also the evidence admitted at trial because the parties "consensually broached" the suppression issue at trial. When parties consensually broach a suppression issue again at trial, the reviewing court should also consider the evidence adduced at trial in gauging the propriety of the trial court's ruling on the motion to suppress. *Black v. State*, 362 S.W.3d 626, 635 (Tex. Crim. App. 2012). Here, the parties both consensually broached the suppression issue at trial by referencing the *Miranda* issue in opening statements, direct- and cross-examination, and closing arguments. We thus agree with Anderson on this point, and we have considered the evidence admitted at both the suppression hearing and at trial in our analysis of this issue. In its brief, the State does not argue that we should not consider the evidence admitted at trial in our analysis; indeed, the State cites heavily to the video from Malwitz's bodycam, which was admitted at Anderson's trial but was not admitted at the suppression hearing.

wrongdoing, Malwitz left Anderson alone in his patrol vehicle for approximately ten minutes. Approximately one minute after he returned, Anderson asked for his name, he gave it, and she said, "How long you think you gonna live, Malwitz? Not that long, I bet you."

We hold that that threat toward Malwitz was not made in response to any interrogation; rather, it was a statement volunteered by Anderson. *See Edwards*, 2023 WL 5115745, at \*10; *Carter*, 2018 WL 5259895, at \*2; *Valentine v. State*, No. 05-03-00656-CR, 2004 WL 886264, at \*1 (Tex. App.—Dallas Apr. 27, 2004, no pet.) (not designated for publication) (holding that defendant's statement to police was not the result of custodial interrogation because the statement was volunteered while the officer was asking him "routine book-in questions unrelated to the offense"). To that end, the statement was not made in response to any question propounded by Malwitz, occurred after Malwitz had been apart from Anderson for ten minutes, and was elicited freely from Anderson without any prompting from Malwitz other than him telling Anderson his name when she had asked for it. Thus, because it was not made in response to an interrogation, we hold that the trial court did not err by admitting evidence of that threat. *See Carter*, 2018 WL 5259895, at \*3 (holding that trial court did not abuse its discretion by denying motion to suppress "[b]ecause the evidence demonstrate[d] that appellant made the statements voluntarily, and not in response to

18

questioning by any officer or any words or actions they should have known were reasonably likely to elicit an incriminating response").[15]

As to the other threats made by Anderson—threats to Malwitz, Hamilton, and the public at large—only one of them was arguably made in response to police questioning. To that end, after Anderson initially threatened Malwitz, Malwitz asked if Anderson wanted to "add terroristic threat." Anderson replied that she "didn't say that"; she then stated, "it's a promise," telling Malwitz that he was "going to regret this little, small shit" and that his "family will, too." Even if we assumed that the trial court erred by not suppressing evidence of that threat, we hold that Anderson has not been harmed.

---

[15]Anderson cites *Mason v. State*, No. 12-16-00266-CR, 2018 WL 345714 (Tex. App.—Tyler Jan. 10, 2018, no pet.) (mem. op., not designated for publication), a case that she claims involves a "parallel . . . situation" to her case. We find *Mason* distinguishable. In *Mason*, an intoxicated defendant asked whether a police officer had a "good boxing game" and stated that he had "a real good boxing game." *Id.* at *1. The officer responded, "[A]re you threatening to assault me?" *Id.* The defendant then told the officer that he would "take [the officer's] life away." *Id.* The defendant later said, "[I]f I ever see you again friend, you better have a good life." *Id.* at *2. The officer responded, "Why's that, sir?" *Id.* The defendant then told the officer to "shut up" and stated that he would "make [the officer] stop breathing." *Id.* The officer asked, "[H]ow do you propose to do that?" and the defendant again told the officer to "shut up" and said, "I'm going to end your breathing." *Id.* The Tyler Court of Appeals overturned the defendant's conviction for retaliation, noting that given the defendant's behavior and intoxicated condition, the officer should have known that his questions were likely to elicit an incriminating response. *Id.* at *4. Here, in contrast, there is no evidence that Anderson was intoxicated. Moreover, Anderson's statement of "How long you think you gonna live, Malwitz? Not that long, I bet you," was not prompted by any questioning from Malwitz, while the threats made in *Mason* were prompted by the officer's questions, "[A]re you threatening to assault me?"; "Why's that, sir?"; and "[H]ow do you propose to do that?" *Id.* at *1–2.

The erroneous denial of a motion to suppress a statement taken in violation of *Miranda* is constitutional error subject to review under the standard set forth in Texas Rule of Appellate Procedure 44.2(a).[16] *Coffey v. State*, 435 S.W.3d 834, 843 (Tex. App.—Texarkana 2014, pet. ref'd); *In re J.T.M.*, 441 S.W.3d 455, 464 (Tex. App.—El Paso 2014, no pet.); *see* Tex. R. App. P. 44.2(a). Rule 44.2(a) requires us to reverse the conviction unless we determine beyond a reasonable doubt that the trial court's refusal to suppress the statements did not contribute to the conviction. *See* Tex. R. App. P. 44.2(a); *Wells v. State*, 611 S.W.3d 396, 410 (Tex. Crim. App. 2020). "If there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error was not harmless beyond a reasonable doubt." *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000); *see also Neal v. State*, 256 S.W.3d 264, 284 (Tex. Crim. App. 2008).

Our harmless-error analysis should not focus on the propriety of the trial's outcome but rather should focus on whether the constitutional error adversely

---

[16]The harm analysis for errors based on Article 38.22 is governed by Rule 44.2(b). *Flores v. State*, No. 01-14-00579-CR, 2018 WL 5070054, at *1 (Tex. App.—Houston [1st Dist.] Oct. 18, 2018, no pet.) (mem. op., not designated for publication). But because Anderson has also alleged that her statements should have been suppressed due to *Miranda*, we will analyze harm under Rule 44.2(a). *See Campbell v. State*, 325 S.W.3d 223, 238–39 (Tex. App.—Fort Worth 2010, no pet.) (applying the constitutional harm standard of Rule 44.2(a) to decide that there was no harm stemming from appellant's *Miranda* complaint and declining to conduct a separate analysis of harm under Rule 44.2(b) pertaining to appellant's Article 38.22 complaint); *see also Funes v. State*, 630 S.W.3d 175, 182–83 (Tex. App.—El Paso 2020, no pet.) (assessing harm under Rule 44.2(a) because appellant raised both a *Miranda* complaint and an Article 38.22 complaint).

affected the integrity of the process leading to the conviction. *See Wells*, 611 S.W.3d at 410; *see also Wesbrook*, 29 S.W.3d at 119 ("[T]he appellate court should calculate as much as possible the probable impact of the error on the jury in light of the existence of other evidence."). To that end, we "should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment.'" *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011) (quoting Tex. R. App. P. 44.2(a)). While the most significant concern must be the error and its effects, the presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error. *Wells*, 611 S.W.3d at 410. We evaluate the entire record in a neutral manner and not in the light most favorable to the prosecution. *Id.* at 410–11.

Here, Anderson made threats to Malwitz that were not in response to police questioning. While she was in his patrol vehicle, Anderson told Malwitz, unprompted by any questioning, "How long you think you gonna live, Malwitz? Not that long, I bet you." Later at the jail, Anderson told Malwitz, again unprompted by any questioning, "What's your name . . . Malwitz? Gonna die. Cause that ain't no threat, you feel me? Everybody gonna die, you feel me?" Thus, even if the trial court erred by admitting Anderson's statements made in response to Malwitz's question of whether Anderson wanted to "add terroristic threat"—that "it's a promise," that he was "going to regret this little, small shit," and that his family would also regret it—

21

the record contains evidence of other threats made by Anderson to Malwitz that were properly admitted. *See Funes*, 630 S.W.3d at 183 (holding that, even if trial court erred by failing to give *Miranda* warnings and failed to comply with Article 38.22, appellant was not harmed by admission of allegedly-improper evidence because other similar evidence was properly admitted establishing appellant's guilt); *Sandone v. State*, 394 S.W.3d 788, 794 (Tex. App.—Fort Worth 2013, no pet.) (similar).

Thus, after carefully reviewing the record and performing Rule 44.2(a)'s required harm analysis, we hold beyond a reasonable doubt that even if the trial court erred by not suppressing Anderson's response to Malwitz's question of whether she wanted to "add terroristic threat," such an error did not contribute to Anderson's conviction. *See* Tex. R. App. P. 44.2(a). We overrule Anderson's second issue.[17]

## IV. CONCLUSION

Having overruled Anderson's two issues, we affirm the trial court's judgment.

---

[17]Anderson also argues that the State conceded error regarding the trial court's admission of her statements to Malwitz. Anderson points to a remark made by a prosecutor during closing argument, in which the prosecutor told the jury, "[I]f you want to believe that Officer Malwitz should have Mirandized the Defendant . . . then your remedy for that would be only to not consider the statements she said in response to questions he asked. . . . You could only exclude the statements in response to what . . . he asked." Anderson also points to a later statement made by a prosecutor during closing argument, in which the prosecutor told the jury, "[I]f you find that Officer Malwitz should have given the Miranda warnings, then disregard the statements that [Anderson] made in response to any of his questions." But neither of those remarks are concessions of error; both simply tell the jury what the remedy would be "*if*" the jury believed that Anderson did not receive proper warnings under *Miranda*. We reject Anderson's contention that the State conceded error.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  July 25, 2024