

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-25-00106-CR

_____

KEITH L. BARNETT A/K/A KEITH L. BARNETT SR., Appellant

V.

THE STATE OF TEXAS

---

On Appeal from Criminal District Court No. 4
Tarrant County, Texas
Trial Court No. 1801605

---

Before Kerr, Birdwell, and Walker, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

A jury convicted Appellant Keith L. Barnett a/k/a Keith L. Barnett Sr. on three counts: (1) intentional or knowing possession of between four and 200 grams of methamphetamine with the intent to deliver, *see* Tex. Health & Safety Code § 481.112(a), (d); (2) intentional or knowing possession of between four and 200 grams of cocaine with the intent to deliver, *see id.*; and (3) possession of a firearm after a felony conviction, *see* Tex. Penal Code § 46.04. The jury also made deadly-weapon findings based on Barnett's using or exhibiting a firearm during both drug offenses. *See* Tex. Code Crim. Proc. art. 42A.054(b). After the punishment phase, the trial court sentenced Barnett to three concurrent 48-year sentences in accordance with the jury's verdicts.

On appeal, Barnett raises two issues. First, he asserts that the trial court erred by admitting DVR surveillance evidence from the trap house[1] where he was arrested because the police delayed nearly five months between seizing and searching the DVR system. Second, he challenges the evidence's sufficiency to support his convictions and the jury's deadly-weapon findings. Because Barnett failed to meet his burden to

---

[1]*See, e.g.*, *Wilson v. State*, No. 02-17-00388-CR, 2019 WL 2041831, at *2 n.4 (Tex. App.—Fort Worth May 9, 2019, pet. ref'd) (mem. op., not designated for publication) ("A 'trap house' is the same as a 'dope house.'"); *Gabriel v. State*, 842 S.W.2d 328, 332 (Tex. App.—Dallas 1992) (op. on reh'g) (describing a "trap house" as "a facility used exclusively for the sale of drugs"), *aff'd*, 900 S.W.2d 721 (Tex. Crim. App. 1995).

establish that he had a reasonable expectation of privacy in the trap house's DVR system and because the evidence is sufficient, we will affirm.

## I. Factual and Procedural Background

In October 2023, the police began investigating potential drug activity at a house located at 4741 Crenshaw Avenue in Fort Worth, Texas. The police installed a pole camera on a streetlight in front of the house, and as they began surveilling, they observed an abnormal amount of short-term vehicle traffic at the house. One of the vehicles was linked to Keith Barnett Jr. (Junior). Using a confidential informant, the police conducted three "controlled buys" from the house. Twice, Junior sold drugs to the informant, and the short-term traffic did not stop when Junior was not present.

The police then obtained a search warrant for the house targeting Junior and served the warrant on November 1, 2023. Junior was not present, but Barnett and another man—Donald Pilot—were. As the SWAT team arrived, Pilot surrendered to the police. Barnett ran into the backyard but quickly gave himself up. On Barnett, the police found $802 in mostly $5 and $20 bills, including a marked $20 bill an informant had used to buy crack cocaine. The police arrested Junior elsewhere.

The police had suspected that the Crenshaw house was a trap house, which their body-camera footage corroborated. The house had exterior surveillance cameras near two exterior doors with a live feed directly into the living room so that the individuals inside could monitor outside activity. Plastic covered the front door's windows.

3

The house contained little furniture: two couches and an ottoman in the living room; several television monitors on the living-room floor; and air mattresses in each bedroom. Minimal clothing and personal effects were in the two bedroom closets. Nothing was on the walls. The kitchen appeared to be used for packaging narcotics instead of preparing food, and the pantry, cabinets, and refrigerator contained little food. The kitchen also contained a camera above the sink pointed at the front door that could record activity in the kitchen and living room and anyone coming through the front door or a side exterior door into the kitchen.

During the house search, the police found two loaded handguns and drugs—including marijuana, methamphetamine, and crack cocaine. The police found drugs and one of the handguns—a black Glock .22 pistol—together in the kitchen. Additionally, the police found a digital scale with a powdery substance on it and baking soda, which can be used to turn cocaine into crack cocaine. The police seized the cameras around and inside the residence that recorded to a DVR system, which they also seized.

On March 28, 2024—148 days after the initial search and seizure—the police obtained a warrant to examine the seized DVR's contents.[2] From the examination, the police determined that the DVR system contained several hundred videos spanning

---

[2]Although the parties both argue about the "149 days" between the November 1, 2023 seizure and the March 28, 2024 search of the DVR system, we calculate the DVR search as happening 148 days after its seizure.

4

the two weeks before the house was searched. Among other things, video footage from the kitchen camera showed Barnett handling drugs, cooking crack cocaine, picking up the Glock from a kitchen drawer while making crack cocaine, holding the Glock and placing drugs on the counter as a man enters the house, and opening the kitchen drawer containing drugs and the Glock during a drug sale.

Before trial, Barnett moved to suppress the evidence obtained from the searched DVR system, asserting that his Fourth Amendment rights had been violated by the State's 148-day delay between seizing and obtaining the warrant to search the DVR equipment. The trial court initially denied the motion on the ground that Barnett lacked standing. But during trial, the trial court reconsidered the issue, determined that Barnett had standing, and then applied a balancing test to conclude that the delay had not violated his Fourth Amendment rights. The jury thus heard police testimony about what they found in the house, saw video evidence linking Barnett to the drugs and the firearms, and convicted him of the drug- and firearm-possession offenses.

## II. Motion to Suppress

In his first issue, Barnett complains that the trial court should have suppressed the kitchen-camera footage from the trap house's DVR system because the police's 148-day delay in getting a warrant to search it was unreasonable and violated the

5

Fourth Amendment.[3] But because Barnett did not show that he had a reasonable expectation of privacy in the DVR system, the trial court properly denied his motion to suppress.

## A. Standard of Review

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *State v. Martinez*, 570 S.W.3d 278, 281 (Tex. Crim. App. 2019). We give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor. *Id.* (first quoting *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010); then citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). We also review questions of law de novo, including "whether particular historical facts give rise to a reasonable expectation of privacy," *see id.* (citing *State v. Hardy*, 963 S.W.2d 516, 523 (Tex. Crim. App. 1997)), and we may consider a ground despite the trial court's stating other bases for its suppression ruling, *see Wilson v. State*, 692 S.W.2d 661, 671 (Tex. Crim. App. 1984) (op. on reh'g).

---

[3]Barnett's motion to suppress invoked both the United States and Texas Constitutions, but on appeal, he does not argue that the Texas Constitution provides greater protections against unreasonable searches and seizures than the Fourth Amendment. We thus review only his federal constitutional arguments. *See Morris v. State*, No. 02-24-00008-CR, 2025 WL 1840469, at *12 n.18 (Tex. App.—Fort Worth July 3, 2025, pet. ref'd) (mem. op., not designated for publication) (citing *Welch v. State*, 93 S.W.3d 50, 52 & n.5 (Tex. Crim. App. 2002)).

Generally, our review is limited to the record at the time of the suppression hearing. *Igboji v. State*, 666 S.W.3d 607, 612 (Tex. Crim. App. 2023). But when the parties relitigate the suppression issue in the trial, our scope of review includes the relevant suppression evidence admitted in both the suppression hearing and the trial. *Turrubiate v. State*, 399 S.W.3d 147, 151 (Tex. Crim. App. 2013), *abrogated on other grounds by Igboji*, 666 S.W.3d at 615; *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996).

## B. Applicable Law

The Fourth Amendment, made applicable to the states by the Due Process Clause of the Fourteenth Amendment, protects "[t]he right of the people to be secure in *their* persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV (emphasis added); *Ker v. California*, 374 U.S. 23, 30–31, 83 S. Ct. 1623, 1628 (1963); *see Kothe v. State*, 152 S.W.3d 54, 59 (Tex. Crim. App. 2004) ("Any defendant seeking to suppress evidence . . . must prove that he was a victim of the unlawful search or seizure . . . [and cannot] complain about the invasion of someone else's personal rights.") (citation modified). Thus, to claim the protection of the Fourth Amendment, a defendant "must have a cognizable Fourth Amendment interest" in the place or thing being searched—a concept known as "Fourth Amendment standing." *Bluntson v. State*, 728 S.W.3d 87, 136 (Tex. Crim. App. 2025), *cert. denied*, No. 25-6476, 2026 WL 795116 (U.S. Mar. 23, 2026) (quoting *Byrd v. United States*, 584 U.S. 395, 410, 138 S. Ct. 1518, 1530 (2018)).

He must not only "claim a justifiable, a reasonable, or a legitimate expectation of privacy" that the government has invaded, *see id.* (quoting *Smith v. Maryland*, 442 U.S. 735, 740, 99 S. Ct. 2577, 2580 (1979) (citation modified)), but he must meet that burden with evidence, *see King v. State*, 670 S.W.3d 653, 657 (Tex. Crim. App. 2023). A defendant "must demonstrate that: (1) by his conduct, he exhibited an actual subjective expectation of privacy in the place searched, and (2) under the circumstances, society is prepared to recognize his subjective expectation as objectively reasonable." *Bluntson*, 728 S.W.3d at 136–37 (first citing *Smith*, 442 U.S. at 740, 99 S. Ct. at 2577; then citing *King*, 670 S.W.3d at 656).

To determine whether a defendant met his burden, we examine the totality of a search's surrounding circumstances and are guided by several non-exhaustive factors:

(1) whether the accused had a property or possessory interest in the place or thing searched;

(2) whether he was legitimately in the place searched;

(3) whether he had complete dominion or control and the right to exclude others;

(4) whether, before the intrusion, he took normal precautions customarily taken by those seeking privacy;

(5) whether the place or thing was put to some private use; and

(6) whether his claim of privacy is consistent with historical notions of privacy.

*King*, 670 S.W.3d at 657 (citing *Granados v. State*, 85 S.W.3d 217, 223 (Tex. Crim. App. 2002)).

8

At the Fourth Amendment's core stands "[t]he right of a man to retreat into *his own home* and there be free from unreasonable governmental intrusion." *Green v. State*, 78 S.W.3d 604, 608–09 (Tex. App.—Fort Worth 2002, no pet.) (emphasis added) (citing *Silverman v. United States*, 365 U.S. 505, 511, 81 S. Ct. 679, 683 (1961)). Even an "overnight guest" may have a legitimate expectation of privacy in his host's home. *Luna v. State*, 268 S.W.3d 594, 603 (Tex. Crim. App. 2008) (citing *Minnesota v. Olson*, 495 U.S. 91, 98, 110 S. Ct. 1684, 1689 (1990)). But the legitimate privacy expectation of an overnight guest does not extend to a casual visitor or a guest who is merely present with the homeowner's consent. *Minnesota v. Carter*, 525 U.S. 83, 90, 119 S. Ct. 469, 473 (1998); *Black v. State*, 776 S.W.2d 700, 701 (Tex. App.—Dallas 1989, pet. ref'd).

Moreover, in contrast to residentially used property, "[p]roperty used for commercial purposes is treated differently" under the Fourth Amendment. *Wade v. State*, No. 2-02-241-CR, 2004 WL 1416111, at *4 (Tex. App.—Fort Worth June 24, 2004, pet. ref'd) (mem. op., not designated for publication) (quoting *Carter*, 525 U.S. at 90, 119 S. Ct. at 474). For example, in *Carter*, the United States Supreme Court explained that visitors packaging drugs in an apartment "were essentially present for a business transaction and were only in the home a matter of hours." 525 U.S. at 86, 90, 119 S. Ct. at 471, 473–74. For them, such an apartment was "simply a place to do business," and unlike their own residences, they had no legitimate privacy expectation. *Id.* at 90, 119 S. Ct. at 474. When a "home is converted into a commercial center to

9

which outsiders are invited for purposes of transacting unlawful business, that business is entitled to no greater sanctity than if it were carried on in a store, a garage, a car, or on the street." *Lewis v. United States*, 385 U.S. 206, 211, 87 S. Ct. 424, 427 (1966); *Kizziar v. State*, 628 S.W.2d 243, 245 (Tex. App.—Fort Worth 1982, pet. ref'd).

**C. Analysis**

Both during the initial suppression hearing and when Barnett raised the suppression issue again in trial, he offered no evidence connecting him to the Crenshaw house and simply questioned the police officers who worked on the case. The State introduced the search-warrant affidavit, which provided some context for each person observed at the house.

The officer who drafted the search-warrant affidavit averred that Barnett had not wanted to speak with the police. The officer also averred that Junior had said that he was at the Crenshaw house merely to wash his clothes and refused to speak further with the police.

On the other hand, the officer noted that Pilot had told them that he had come over to mow the lawn, but he later admitted that he was homeless and "was paid to be allowed to stay" at the Crenshaw house for about a week. Pilot did not identify who had paid him. He initially claimed that he would open the door for people coming inside and did not know why they were there because he would close his eyes when they entered. But he later admitted to selling crack cocaine.

Importantly, Barnett did not show that he owned, leased, or ever stayed overnight at the Crenshaw house—with or without the owner's authorization to be there. Nor did Barnett offer any evidence that he had a key to the property.[4] In fact, multiple officers testified that they did not know who owned or leased the house. Thus, it is unclear whether the Crenshaw house's owner even knew that anyone, including Barnett, was using it to make and sell drugs.

In contrast, the record definitively showed that the Crenshaw house was not Barnett's primary residence. An officer testified that after they arrested Barnett, he told them that he lived at 4209 Carmel Avenue, and the police went to that location to continue their investigation and spoke there with his father. The Carmel address is identified in the Clerk's Record as Barnett's address, which the trial court judicially noticed.

The police officers testified that instead of being anyone's primary residence, the Crenshaw house was being used as a trap house. Describing a trap house, one officer testified that it is "a residence that is used commonly to store, distribute, or use narcotics in. And, typically, it's not the main seller's primary residence." He instead "attribute[d] it to, like, their office." This is so because "[t]hey live somewhere else, they come to the office, sell drugs, and then they go back home."

---

[4]The police found a key in a red jacket in the living room, but no one testified to what lock the key opened.

11

As we have described above, the evidence corroborated the police's belief that the property was being used as a trap house. The police found sparse clothing in the bedroom closets. Yet no one testified whose clothes were present or specifically linked them to Barnett, as opposed to Junior, Pilot, or the other people seen coming and going from the house.

An officer acknowledged that the presence of sparse clothing and blow-up mattresses could show that the residents were simply impoverished. But he testified that based on the totality of the circumstances—the interior and exterior cameras, the covered windows, the lack of food and barren kitchen cabinets, the lack of wall hangings, and the like—the Crenshaw house was "just solely being used for a place to distribute narcotics from."

Because the State had charged Barnett with drug- and firearm-possession crimes, it needed to link him to the drugs and firearms that the police had found in the house, and Barnett points to that testimony to make his standing argument. Concerning one officer's testimony describing what a trap house is and what the officers found—including the seized drugs and firearms—Barnett's counsel asked whether the officer believed that Barnett was "in possession of those items." The officer agreed that "Barnett had access to those items and care or custody of their control."

Counsel then asked the officer whether he thought that Barnett was also in possession of the DVR system that day, and the officer again agreed that "Barnett had

12

access and care or custody of control of that DVR." When asked to clarify whether it was his position that Barnett possessed the DVR system, the officer testified, "Not physically. It was not on his person, but . . . Barnett resided there with the DVR, correct." The State then objected as Barnett's counsel asked whether the officer thought that Barnett "had a possessory interest in it," and the officer never answered that question.

The trial court ultimately described this DVR-possession testimony as "rank speculation." And indeed, given that the record showed where Barnett actually resided—Carmel Avenue—and the utter lack of any evidence linking him to the owner of the Crenshaw property, the trial court correctly questioned the officer's characterization of Barnett's relationship to the DVR system and his expectation of privacy in the Crenshaw house and its DVR system.

But other evidence similarly pointed to Barnett's not having an expectation of privacy in the house's DVR system. For example, an officer testified that the DVR system was password protected. Barnett, however, offered no evidence that he knew the password or had access to the footage being recorded. That a camera connected to the DVR system was present in the Crenshaw kitchen while Barnett also was—and was within physical reach, like the drugs and firearm in the kitchen—did not indicate that Barnett owned, had access to, or controlled the DVR system giving rise to a legitimate expectation of privacy in the video footage.

13

In sum, Barnett—who lived elsewhere—did not show that he owned the Crenshaw home, was an overnight guest, had the owner's consent to be present, or even maintained any clothes or belongings in the property. *See Carter*, 525 U.S. at 90, 119 S. Ct. at 473; *Black*, 776 S.W.2d at 701 (holding that individual with no possessory or proprietary interest in premises, who has no clothes or other belongings in a house, has no legitimate privacy interest in the premises). He did not show that he had a key to the property or the password to the DVR system; rather, the evidence showed that Barnett and others used the Crenshaw property to make and sell drugs. *See Windom v. State*, 379 S.W.3d 463, 468 (Tex. App.—Beaumont 2012, no pet.) ("[A] visitor who did not stay the night, had no control over the apartment, and was there temporarily for a business transaction, may have had no legitimate privacy interest in the premises searched." (citing *Villarreal v. State*, 935 S.W.2d 134, 139 (Tex. Crim. App. 1996))); *McDaniel v. State*, No. 11-05-00276-CR, 2007 WL 1705704, at *4 (Tex. App.— Eastland June 14, 2007, no pet.) (mem. op., not designated for publication) (stating that "[t]he lack of furniture and the frequent drug transactions indicate that appellant . . . [was] using the residence for illegal drug activity"—a use that did not meet the *Granados* factors); *Wade*, 2004 WL 1416111, at *4 (holding that a defendant who had a key to—but who did not own, lease, or live in—his brother's tin-walled shop building lacked standing to contest evidence seized from the building).

Considering the totality of the circumstances, we cannot conclude that Barnett had a reasonable expectation of privacy in the trap house's DVR system. *See Carter*,

14

525 U.S. at 90, 119 S. Ct. at 474; *Windom*, 379 S.W.3d at 468; *McDaniel*, 2007 WL 1705704, at *4; *Wade*, 2004 WL 1416111, at *4. Because Barnett failed to establish his Fourth Amendment standing, he failed to demonstrate that the trial court erred by denying his motion to suppress.[5] We overrule Barnett's first issue.

### III. The Evidentiary Sufficiency

In his second issue, Barnett argues that with or without such video evidence, the evidence was insufficient to support his drug-possession convictions and the jury's related deadly-weapon findings and his firearm-possession conviction. We disagree.

### A. Standard of Review

In our evidentiary-sufficiency review of the elements of an offense, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

---

[5]We need not reach Barnett's argument concerning whether the 148-day delay violated his Fourth Amendment rights. *See* Tex. R. App. P. 47.1.

15

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608.

To determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by a hypothetically correct jury charge to the evidence adduced at trial. *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021); *see also Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("The essential elements of an offense are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Hammack*, 622 S.W.3d at 914. The law as authorized by the

16

indictment means the statutory elements of the offense as modified by the charging instrument's allegations. *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021).

## B. The Drug-Possession Convictions

Here, Barnett was charged with and convicted of possession with intent to deliver two controlled substances—methamphetamine and cocaine. Section 481.112 of the Texas Health and Safety Code states that "a person commits an offense if the person knowingly . . . possesses with intent to deliver a controlled substance listed in Penalty Group 1" and that "[a]n offense . . . is a felony of the first degree if the amount of the controlled substance to which the offense applies is, by aggregate weight, including adulterants or dilutants, four grams or more but less than 200 grams." Tex. Health & Safety Code § 481.112(a), (d); *see also Kibble v. State*, 340 S.W.3d 14, 18 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) ("To demonstrate possession of cocaine [or methamphetamine] with intent to deliver, the State is required to show that (1) appellant knowingly or intentionally, (2) possessed, (3) cocaine [or methamphetamine], (4) in an amount of greater than four but less than two hundred grams, (5) with the intent to deliver the cocaine [or methamphetamine].").[6]

---

[6]Barnett does not challenge the amount of the substances recovered, the intent-to-deliver element, or that the substances were controlled substances. Thus, we need focus only on the possession element. *See, e.g., Johnson v. State*, 583 S.W.3d 300, 307 (Tex. App.—Fort Worth 2019, pet. ref'd) (per curiam) (mem. op.).

Barnett's sufficiency challenge focuses on whether he possessed the substances. Both the Texas Health and Safety Code and the Texas Penal Code provide the same definition for "possession": "actual care, custody, control, or management." *See* Tex. Health & Safety Code § 481.002(38); Tex. Penal Code § 1.07(a)(39). Thus, "[t]o prove unlawful possession of a controlled substance, the State must prove that[ ] (1) the accused exercised control, management, or care over the substance; and (2) the accused knew the matter possessed was contraband." *Poindexter v. State*, 153 S.W.3d 402, 405 (Tex. Crim. App. 2005), *abrogated by Robinson v. State*, 466 S.W.3d 166, 173 & n.32 (Tex. Crim. App. 2015). Barnett does not contend that the evidence is insufficient to prove that he knew the substances were contraband; he limits his attack to the sufficiency of the evidence establishing his control and management of the substances because, in his view, "[t]he evidence fails to establish any meaningful link between [him] and the narcotics found at 4741 Crenshaw Avenue."

A person's "fortuitous proximity" to drugs is not sufficient to establish possession; there must be an affirmative link between the defendant and the substances:

> The "affirmative links rule" is designed to protect the innocent bystander from conviction based solely upon his fortuitous proximity to someone else's drugs. This rule simply restates the common-sense notion that a person—such as a father, son, spouse, roommate, or friend—may jointly possess property like a house but not necessarily jointly possess the contraband found in that house. Thus, we have formulated the rule that "[w]hen the accused is not in exclusive possession of the place where the substance is found, it cannot be concluded that the accused had knowledge of and control over the

18

contraband unless there are additional independent facts and circumstances [that] affirmatively link the accused to the contraband."

*Id.* at 406 (citations omitted).

As with any other element of an offense, the affirmative link may be established by direct or circumstantial evidence. *See Evans v. State*, 202 S.W.3d 158, 162 (Tex. Crim. App. 2006) ("However, presence or proximity, when combined with other evidence, either direct or circumstantial (*e.g.*, "links"), may well be sufficient to establish that element beyond a reasonable doubt.").

The courts have formulated a nonexclusive list of factors to examine in determining whether the necessary links exist:

> (1) the defendant's presence when a search is conducted; (2) whether the contraband was in plain view; (3) the defendant's proximity to and the accessibility of the narcotic; (4) whether the defendant was under the influence of narcotics when arrested; (5) whether the defendant possessed other contraband or narcotics when arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the defendant owned or had the right to possess the place where the drugs were found; (12) whether the place where the drugs were found was enclosed; (13) whether the defendant was found with a large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt.

*Tate v. State*, 500 S.W.3d 410, 414 (Tex. Crim. App. 2016) (quoting *Evans*, 202 S.W.3d at 162 n.12).

As the court of criminal appeals notes, "Although these factors can help guide a court's analysis, ultimately the inquiry remains that set forth in *Jackson*: Based on the

combined and cumulative force of the evidence and any reasonable inferences therefrom, was a jury rationally justified in finding guilt beyond a reasonable doubt?" *Id.* (citing *Jackson*, 443 U.S. at 318–19, 99 S. Ct. at 2789). When analyzing the sufficiency of the evidence supporting the element of possession, we cannot focus our analysis on "each circumstance of guilt in isolation without considering the cumulative force of all of the evidence." *Id.* at 417. Our review based on this cumulative view of the evidence requires that "the logical force of all of the admitted evidence must be considered in the light most favorable to the conviction, meaning that all reasonable inferences from the evidence must be resolved in favor of the jury's guilty verdict." *Id.*

Although we consider the above factors, we need not mechanically check off those that are present, but we instead examine the cumulative force of the evidence in the light most favorable to the conviction to determine whether it supports a reasonable inference of possession. Here, it does.

The record contains the following evidence supporting such an inference:

- One of the officers who arrested Barnett in the Crenshaw's house's backyard identified him at trial.

- As the videos played for the jury, another officer identified Barnett in the videos, stating among other things, "The Defendant here is reaching into the cabinet where the majority of the drugs were located, and in the cabinet you can see the plastic bags containing different types of narcotics."

- Barnett, Junior, and Pilot can be seen in the house on the videos in a period spanning more than two weeks before the search.

- Barnett was at the house alone, with Junior or Pilot individually, or with both Junior and Pilot. He repeatedly went into the kitchen drawer and kitchen

cabinets where drugs were located. A firearm was also clearly visible in the drawer.

- Barnett removed a bag of marijuana from a kitchen drawer and weighed it on the scale. He handed a bag of marijuana to a drug customer and received payment in cash.

- One time, when Barnett was not in the kitchen but on the living-room couch, he reached under the living-room ottoman into a concealed, zippered area and removed what a police officer believed was a bag of narcotics.

- In another video, Barnett grabbed a scale and packaged something that a police officer testified was likely narcotics.

- Video also showed Barnett cooking crack cocaine, including weighing the cocaine and baking soda. In the process of cooking the crack cocaine, he opened a kitchen drawer in which a firearm can be seen.

- An officer testified that he had interviewed a woman who was seen on the video. She told the officer she was there to purchase cocaine. The officer explained to the jury when the video showed "the Defendant . . . , again, opening the drawer" containing the narcotics and the "black handgun" and Barnett's holding a "baggy that appears to contain a white powdery substance."

- At another point, the officer explained that Barnett was seen "placing cocaine on a scale and measuring it."

- Barnett fled into the backyard during the police raid, and the video shows him being arrested.

- The police found the marked money on Barnett that had been used by a police informant in a controlled drug buy. They also found a THC vape on him.

- Controlled substances, including marijuana, methamphetamine, and crack cocaine, were found in the house when the SWAT team entered. A plastic bag containing a white powdery substance sat next to a digital scale with a white powdery substance on it openly displayed on the counter.

The jury is the sole judge of the witnesses' credibility and the weight to be afforded their testimony. *See Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App.

21

2013); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We thus defer to the jury's credibility and evidentiary-weight determinations and give due deference to their resolution of any conflicts in the testimony, the weight the jury gave the evidence, and the reasonable inferences they drew from the testimony and evidence. *See Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778.

Based on our reviewing the evidence in the light most favorable to the verdict, we conclude that sufficient evidence exists from which a rational jury could have found that Barnett possessed the methamphetamine and cocaine that the police seized from the Crenshaw property. The cumulative force of all the incriminating circumstances supports the jury's findings on the drug-possession offenses.

## C. The Firearm-Possession Conviction

Concerning Barnett's conviction for unlawful possession of a firearm by a felon, we analyze evidentiary sufficiency under the same rules adopted for determining evidentiary sufficiency in cases of unlawful possession of a controlled substance.[7] *Robinson v. State*, Nos. 02-15-00039-CR, 02-15-00040-CR, 2016 WL 2766746, at *2 (Tex. App.—Fort Worth May 12, 2016, no pet.) (mem. op., not designated for publication); *Bates v. State*, 155 S.W.3d 212, 216 (Tex. App.—Dallas 2004, no pet.). Thus, the State was required to prove, among other things, that the accused exercised

---

[7]Barnett did not challenge any other element of his firearm-possession conviction.

actual care, custody, or control of the firearm. *Robinson*, 2016 WL 2766746, at \*2; *Bates*, 155 S.W.3d at 216; *see* Tex. Penal Code § 46.04(a).

We detail the pertinent evidence:

- The police found one of the firearms—the Glock—loaded, in the top kitchen drawer, directly below where the scale and bag of powdered substances were located, and they found another firearm underneath a couch cushion in the living room.

- Video evidence showed Barnett—while cooking the crack cocaine—pick up the Glock that was in the kitchen counter drawer and hold it at his side as he looked toward the side door and at an unidentified woman standing behind him. He then returned the firearm to the drawer.

- Another video showed him open the drawer containing the drugs and the Glock as a man came inside and bought drugs. With the drawer pulled out, Barnett exhibited the Glock to anyone looking in the drawer and had it within reach.

In reviewing the evidence in the light most favorable to the verdict, we conclude that the evidence is sufficient for a rational jury to find that Barnett possessed the firearms that the police seized from the Crenshaw property. The cumulative force of all the incriminating circumstances suffices to support the jury's finding on the firearm-possession offense.

## D. The Deadly-Weapon Findings

Relatedly, Barnett challenges the deadly-weapon findings the jury made concerning the two drug offenses. A deadly-weapon finding is proper if the defendant used or exhibited a deadly-weapon during the commission of a felony offense or during immediate flight therefrom. *See* Tex. Code Crim. Proc. art. 42A.054(b). The

23

term "use," in the context of a deadly-weapon finding, means "'any employment of a deadly weapon, even simple possession, if such possession facilitates the associated felony.'" *Coleman v. State*, 145 S.W.3d 649, 652 (Tex. Crim. App. 2004) (quoting *Patterson v. State*, 769 S.W.2d 938, 941 (Tex. Crim. App. 1989)). The term "exhibit" requires a weapon to be "consciously shown, displayed, or presented to be viewed." *Id.* (quoting *Patterson*, 769 S.W.2d at 941).

In determining whether a weapon was used as a deadly weapon in furtherance of possessing a controlled substance, we consider the cumulative effect of several factors, including: (1) the type of gun involved; (2) whether it was loaded; (3) whether the gun was stolen; (4) the proximity of the gun to the drugs, drug paraphernalia, or drug manufacturing materials; (5) the accessibility of the gun to the person's controlling the premises; (6) the quantity of drugs involved; and (7) any evidence that might demonstrate an alternative purpose for the gun's presence. *Id.* at 658–60 (Cochran, J., concurring); *see Escobedo v. State*, Nos. 2-09-00348-CR, 2-09-00349-CR, 2-09-00350-CR, 2010 WL 4924982, at *4 (Tex. App.—Fort Worth Dec. 2, 2010, no pet.) (mem. op., not designated for publication) (reciting *Coleman* factors). We focus on the proximity of the firearm to the drugs, not to the defendant. *Coleman*, 145 S.W.3d at 654–55.

As we have detailed above, the kitchen-video footage showed Barnett's picking up the Glock from a kitchen drawer while making crack cocaine, holding the Glock and placing drugs on the counter as a man enters the house, and opening the kitchen

24

drawer containing drugs and the Glock during a drug sale. After police raided the house, they found drugs and the Glock together in the kitchen.

Viewing all the evidence in the light most favorable to the jury's finding and taking all the relevant factors into consideration, we conclude that a rational fact-finder could determine that Barnett used at least the Glock pistol shown in the video to protect the drugs and cash and hence to facilitate his possession and delivery of methamphetamine and cocaine. *See Castillo v. State*, 426 S.W.3d 135, 139 (Tex. App.—Houston [1st Dist.] 2012, no pet.); *Escobedo*, 2010 WL 4924982, at *4–5. The evidence is sufficient to support the jury's deadly-weapon findings concerning the drug offenses. We overrule Barnett's second issue.

## IV. Conclusion

Having overruled Barnett's two issues, we affirm the trial court's judgments.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: May 21, 2026